# ARMSTRONG *v.* ASHLEY.*

EQUITABLE LIENS: DEEDS, RECORDATION OF; CONSTRUCTIVE NOTICE; MORT-
GAGES.

1. The grantee of an occupant of land in bad faith can have no better right
than his grantor had to an equitable lien for improvements erected on
the land before eviction.
2. While one who deals with land is required to take notice of all con-
veyances on record at the time, nothing placed on record after one has
acquired title to the property, otherwise than by himself, or by his pro-
curement, can legally affect his rights.
3. Where an occupant of land against whom ejectment suits are pending to
recover the possession thereof mortgages the land and with the pro-
ceeds erects improvements thereon, the mortgagee cannot, after the
ejectment suits have resulted in the eviction of the mortgagor, suc-
cessfully maintain a suit in equity to subject the land in the possession
of the true owners to an equitable lien for such improvements, on the
ground that they had constructive notice by the record of the mortgage
that it was the money of the mortgagee that was used in the. im-
provement of the land, and that they failed to notify the mortgagee
of their title or warn him of the fraud that was being perpetrated on
him by the mortgagor.
4. While, if the recorder of deeds fails to correctly transcribe a deed filed
for record so that a person afterwards dealing with the property
covered by the deed is misled, the parties in interest are bound by the
record rather than by the original deed, there is no record of a declara-
tion or amended declaration in ejectment other than by its filing;
and the original paper itself becomes the record and speaks for itself;
and one who would accurately know its contents must have recourse to
the document itself and not rely upon the docket or index kept by the.
clerk of the court.
5. Where, between the date of the filing of a declaration in ejectment and
the filing of an amended declaration in which additional property is

---

*\*Improvements — Compensation.* — As to right to compensation for
improvements, see the following editorial notes presenting the authorities
on their respective branches of the subject: Liability of cotenants for,
note to *Ward* v. *Ward,* 29 L. R. A. 449; improvements made on partner-·
ship lands, note to *National Union Bank* v. *National Mechanics' Bank,* 27
L. R. A. 484; rights in respect to compensation for improvements made on
land in good faith under an oral contract or gift, note to *Luton* v. *Badham*,
53 L. R. A. 337; subsequent promise to pay for, when made without
promisor's consent, note to *Trimble* v. *Rudy,* 53 L. R. A. 375.

claimed, the defendant mortgages such additional property, the fact that the clerk of the court, who had entered upon the docket and upon an index of ejectment suits kept by him, a description of the property as contained in the original declaration, failed to so enter a description of the additional property claimed in the amended declaration, will not justify the mortgagee in claiming that he did not have constructive notice of the pendency of ejectment suit when he made the mortgage loan.

No. 1313.  Submitted June 4, 1903.  Decided June 25, 1903.

HEARING on an appeal by the complainant from a decree of the Supreme Court of the District of Columbia in a suit to have an equitable lien declared against certain real estate for the value of improvements placed thereon by the complainant.

*Affirmed.*

The COURT in the opinion stated the case as follows:

This is a suit in equity instituted in the supreme court of the District of Columbia by the appellant here, Johnston Armstrong, as complainant against the appellees, James A. Ashley, Mary M. Ashley, Hayden H. Ashley, Ralph B. Ashley, Mary A. Breckenridge, Henry F. Beardsley, Joseph R. Beardsley and Emma B. Jenkins, as defendants, to have an equitable lien declared against lands held and owned by the defendants for the value of certain improvements placed upon said lands with money of the building and loan association, claimed to have been advanced in good faith by it to the person who constructed the improvements and who appears to have claimed the lands adversely to the defendants. The proceeding is collateral to other litigation concerning the same lands which was heretofore before this court in the case of *Bradshaw* v. *Ashley,* 14 D. C. App. 485, and which was also taken to the Supreme Court of the United States, and is found reported in 180 U. S. 59, 45 L. ed. 423, 21 Sup. Ct. Rep. 297, to which reports reference may be had for something of the history of the original controversy, of which the present is an outgrowth.

The lands in controversy are some lots in square No. 939 in

VOL. XXII—24

this city, the original record title of which was in one George
Walker, apparently a Scotch speculator, who, after his acquisi-
tion, seems to have abandoned them and to have returned to
Europe.   Subsequently the lots were sold for taxes, and a tax
deed was given for them during the first half of the last century,
and the title acquired under this deed, whatever it was, became
vested in the present appellees, who and whose grantors seem to
have exercised various acts of ownership over the land and to
have acquired an inchoate possessory title to it.

Besides this irregularity in the title, considerable confusion
has arisen from the fact that upon the original plats of the city of
Washington there are two sets of numbers attached to the lots in
this square, one in ink and the other in lead pencil marks, which
do not concur with each other, and of which the lead pencil marks
would seem to have been the more correct.   In the present pro-
ceeding, as well as in the former case, reference is frequently had
to this distinction, although it does not seem to have greatly, if
at all, affected the merits of the present controversy.

Some time in the year 1889, 1890, or 1891,—for the record is
not very clear on the point, and it is of no importance to the de-
termination of the present case,—one Aaron Bradshaw, acting,
as it is alleged, as the agent of one John H. Walter, who claimed
to have acquired the record title of George Walker, although
there seems never to have been any proof adduced of such acqui-
sition, in a somewhat riotous manner took forcible possession of
the lots in question, and proceeded to erect a small brick structure
on the corner lot designated as "Ink Lot 1," or "Pencil Lot 4,"
whereby to continue to hold such possession.

Subsequently to this, in the months of September, October,
and December of 1891, the Ashleys, by which general name we
may, for the purpose of brevity of statement, designate the ap-
pellees or those of them and their ancestors who were then in in-
terest,—for there have been changes in interest by death and mar-
riage,—instituted four several suits in ejectment in the supreme
court of the District, numbered on the docket of that court as
Nos. 32,039, 32,040, 32,181, and 32,182, respectively, each to
recover separate undivided interests in the lot designated as "Ink

Lot. No. 1." On March 6 and March 11, 1893, the declarations in all the causes were amended by the inclusion of other lots in the same square besides "Ink Lot 1;" and these other lots comprised the property involved in the cause now before us. There were several subsequent amendments, but it does not appear that they are material to the determination of this cause.

Subsequently, in December of 1895, three other suits in ejectment were instituted in the supreme court of the District by others of the Ashley heirs against Bradshaw for the recovery of undivided interests in the same property, and these suits were numbered on the docket as Nos. 39,040, 39,063, and 39,064, respectively.

All these suits, except No. 32,181, appear to have been consolidated for trial in 1897; but no trial was then had, or for about four years afterwards. They seem to have been permitted to rest to await the result of No. 32,181, which was in the name of Nehemiah B. Ashley against Aaron Bradshaw, and which appears to have been selected and prosecuted as a test case. This was tried in June of 1897, and there was judgment rendered in it for the plaintiff, which was affirmed by this court on appeal (*Bradshaw* v. *Ashley,* 14 App. D. C. 485), and subsequently also by the Supreme Court of the United States (*Bradshaw* v. *Ashley,* 180 U. S. 59, 45 L. ed. 423, 21 Sup. Ct. Rep. 297). When the mandate of this court in that case went down, there was trial in all the other consolidated cases resulting in verdict and judgment for the several plaintiffs, who were thereupon placed in possession of the property. The title of the appellees was thereby sustained, and that of Walter and Bradshaw shown to be invalid.

It appears further, that on March 1, 1890, previously to the institution of these several ejectment suits, the Ashleys had filed a bill in equity, No. 12,318, against Walter, Bradshaw, and others, wherein they alleged their claim of ownership of the property and sought to enjoin the defendants from setting up title thereto. But this suit was not diligently prosecuted, and for failure of prosecution it was dismissed on July 1, 1893.

On October 23, 1893, an agreement was consummated between Bradshaw, who had in the meantime acquired from Walter such

title as the latter had, and a building association, known as the New South Building and Loan Association, of New Orleans, in the State of Louisiana, whereby this association agreed to advance to Bradshaw the sum of $20,000, to be secured by mortgage or deed of trust on the lots in question, which were then involved in the ejectment suits, and to be used for the construction of buildings on the lots. The deed of trust was then and there executed and recorded upon what is now assumed by the appellant to have been a sufficient investigation of the title, and the money was advanced to Bradshaw by the association from time to time, as required by the work of construction, in five several instalments, the last of which was paid in April of 1894.

At the time of this arrangement between Bradshaw and the building association the latter had several stockholders in this District, including Walter; and it had a local board here composed of such stockholders, whereof Walter was president, and whose duty it was to pass upon all local applications for loans before they were sent to the general officers or the general board in New Orleans. It had also a local attorney, one Aughinbaugh, whose duty it was to pass prima facie upon the title of any property upon which it was sought to procure a loan. Loans could only be made to stockholders, and Bradshaw became a stockholder for the purpose of procuring the loan. A "chain of title," as it is called, or statement of deeds on record purporting to affect the property in question was made or procured by Aughinbaugh, and accepted by the local board and by the officers of the association in New Orleans, notwithstanding that on the face of it, it was so grossly defective as to show no title whatever in Walter or Bradshaw. While it purported to show all conveyances of the so-called record title, it derived the title of Walter and Bradshaw from some persons claiming to be heirs of one Ralph Walker, between whom and George Walker, the original owner, no connection whatever was shown. This chain of title, which omitted, and, as it would appear, purposely omitted, the tax deed and other deeds, if any there were, under which the Ashleys claimed, was afterwards continued by other examiners of title; but none of these seem to have in any manner revised the state-

ment given by Aughinbaugh. Mention was made in an accompanying letter or certificate by Aughinbaugh of the equity suit No. 12,318, which had been dismissed; but no mention was made of the pending ejectment suits. In fact, it would seem that they had been studiously omitted.

In a short time after procuring the loan Bradshaw defaulted in the payments which he was to make upon the stock held by him, which was according to the usual mode of repayment of such loans to building associations. This was in 1894, and some steps were taken by the association to foreclose under the deed of trust. But this purpose was abandoned in consequence of an arrangement which had been made by its local attorney at the time and Bradshaw, whereby the latter executed a power of attorney by which he turned over the property to the attorney to manage it and collect the rents and pay such rents over to the association; and Bradshaw and the association were to join their forces to defend and defeat the ejectment suits. It does not appear that the association received anything from the rents, and, as already stated, the ejectment suits resulted disastrously to Bradshaw and his claims, and necessarily also to the mortgage held by the association, and to any further collection of rents by its attorney.

In the meantime, in the year 1899, embarrassed by this and other unfortunate and ill-advised loans which it had made, the affairs of the association were placed in the hands of a receiver, and the appellant, Johnston Armstrong, who had been its attorney in New Orleans, was appointed receiver. Armstrong also received an ancillary appointment as receiver in this District by a decree of the supreme court of the District in proceedings instituted for the purpose. Thereupon he instituted the present proceedings by filing his bill in equity.

In and by this bill, wherein the action of Bradshaw, Walter, and Aughinbaugh is denounced as a gross fraud intended by them to defraud the association of its money, it is sought to charge the land in the hands of the Ashleys with an equitable lien in favor of the association, on the ground that the Ashleys had notice, constructively, by the record of the mortgage from Bradshaw to the association, that it was the money of the association

that was used in the construction of the buildings, and failed to notify the association of their title or to warn the association in any manner against the fraud that was being perpetrated upon it. The defendants in their answer denied any personal knowledge of the transactions of the association with Bradshaw, or with Bradshaw, Walter, and others, and of the fraud alleged to have been perpetrated by these upon the association; and denied that they had any knowledge, personal or constructive, of the source whence Bradshaw derived the money which he used in the construction of the buildings, until February, 1895, when the attorneys of the association at that time notified them of the fact, and the defendants promptly offered to sell to the association the lots covered by the buildings at their market value at the time without reference to the buildings, a proposition which was not accepted by the association. They aver that the association preferred to contest the ejectment suits than to accept such offer. And they aver, also, that, instead of standing idly by, when someone commenced making the excavations for the buildings, they promptly notified such person that he would be held as a trespasser.

After replication filed, and again at the hearing, it was sought to amend the bill by introducing an allegation to the effect that there was kept in the office of the clerk of the supreme court of the District, for the convenience of examiners of title, an index book of reference showing the ejectment suits entered and the property which they affected; and that, while this index book contained entries of the ejectment suits hereinbefore mentioned, and of lot 1, in square 939, as being claimed in them, yet, when the declarations were amended, the clerk failed to add to lot 1 the other lots which were included in the amendment, and the index book failed to show said lots when its examiners, subsequent to Aughinbaugh, examined them. This amendment does not seem to have been formally allowed by the court; but the court appears to have considered it as though it had been allowed.

In connection with the subject-matter of this amendment it appears in the testimony that in the ordinary docket which the clerk of the court keeps of all suits entered, and of the proceed-

ings therein, there is entered at the head of the page devoted to each case the number of the case on the docket, the names of the parties, plaintiff and defendant, the nature of the action and property sued for, and the names of the attorneys for the plaintiff and defendant, respectively; that in these Ashley-Bradshaw ejectment suits, lot 1, in square 939, was entered as the property sued for, but that there was no mention here of the additional property when the other lots were included in the amended declarations afterwards filed.

It is sought to make the Ashleys responsible for these alleged failures of the clerk of the court to make these additions to the docket and the index book, as it is claimed that they tended to mislead the association to its detriment. It is nowhere alleged, however, that the association or those who examined the records for it were so misled, and there is no proof of such misleading.

Voluminous testimony, much of it unnecessary and irrelevant, was taken in the case. Upon consideration of it, and of the pleadings, the court held that the complainant had made no case for relief, and accordingly dismissed the bill. From the decree of dismissal the complainant has appealed to this court.

[The opinion of the lower court, which was delivered by Mr. Justice Hagner, who heard and decided the cause in that court, was as follows:

The plaintiff and the defendants charge each other with the knowledge of facts which create a liability by its opponent or a defense to its claim to recover.

1. The defendants charge that the association when it delivered its money to Bradshaw was chargeable with knowledge, actual or *constructive,* of the existence of the suits involving the title to the land.

It would be idle to contend that Bradshaw and those connected with him and the company to defraud, as charged by the complainant, was not aware of the existence of the suits, for he was actually defending, in one court or another, such of them as had not already gone to judgment. Nor could it be supposed that

Walter, the alleged leader in the fraud charged, who was one of the local board of the association, or Aughinbaugh, the counsel of the association, were not equally aware of the same facts. Had the *complainant* association, through its officers, such knowledge? If they had the means of knowledge at hand and neglected to avail themselves of them, the association must be equally held to possess the requisite knowledge.

The entries on the records of the court, accessible to all who chose to examine them, would have informed any intelligent inquirer of the existence and condition of the suits. Parties are not allowed, with such lights before them, to close their eyes and insist they did not see what was obvious upon ordinary inspection. The association necessarily would be obliged to employ an attorney to make the requisite searches; but whether it neglected to employ any attorney at all or employed one incompetent or dishonest is immaterial. The defendants are not to blame, if Aughinbaugh was the knave the complainant charges he was, and was bribed by the extra fee paid him by Bradshaw out of the money lent by the association.

I have decided to consider the new matter charged in the amended bill, as to the absence of the names of some of the ejectment cases from the subsidiary list of the suits, voluntarily made up in the clerk's office for the supposed convenience of attorneys. But being improvised by the clerk, without legal requirement, it would be impossible to receive the index as competent evidence of the contents of the dockets; and no attorney would feel he had properly performed his duty in making a search, if he should content himself with running down that list, instead of examining the original entries of the ejectment suits in the legal dockets. With what justice can a party plaintiff in some of the cases be held answerable in any way for the omission from the list of the names of cases he has properly instituted and which were regularly entered on the appropriate court docket. When the counsel has filed his declaration with the clerk he will have done all he is required to do, and whatever remains to be done in the way of indexing the cases is to be attended to by the clerk without any responsibility for the officer's omissions of officials on the part of

the plaintiffs; and there is no ground for the charge that the plaintiffs in the suits were culpable because the clerk made mistakes.

But apart from the notice imputed to the plaintiff by the presence of the suits on the dockets and on the regular indexes, the evidence sufficiently shows the plaintiff had sufficient actual information to put him on inquiry at the least, as to the existence of the suits from other sources. In the letter of the chief attorney of the New Orleans company to Acker, its local counsel in Washington, written in October 1893, before the money was paid over, the writer refers to the former equity suit brought by the present defendants against Walter and others, which prayed for an injunction upon the same grounds as those set forth in the defendants' answer in the present case. That bill charged fraudulent and illegal acts on the part of Walter and his confederates in undertaking to seize possession of the lots, which were claimed to belong to the plaintiffs therein (the present defendants), and specially described the suits past and then existing, and denied to Walter and Bradshaw any manner of right to the possession of the lots. The letter also called attention to the fact that the bill referred to had been dismissed only "for want of prosecution," and "without prejudice," and invited special attention by Mr. Acker to these facts.

The conclusion that there must be imputed to the association knowledge of the various suits that had been brought by the defendant before the advance of the money by the association is supported by the effect of the whole evidence on both sides; particularly by that of Acker who is written to in his character of local attorney of the association in Washington. And if, as I am forced to believe, the imputation of such knowledge must be charged against the complainant association, its possession and control of the improvements upon the lots cannot be considered as that of an innocent holder without notice.

2. On the other hand the association charges that the defendants must have known of the erection of the houses during the six or seven months they were in process of building, and further that they were being built with the money of the association on

land to which the defendants claimed Bradshaw had no just right; and yet, as they insist, the officers of the association, stood by in silence and gave no information to the association to prevent the further progress of the fraud of Bradshaw, Walter, and their associates.

To the charge that the defendants personally knew of the advances by the association towards the erection of the buildings, they interpose in their answer a positive denial; but they admit that, although wholly ignorant of the sources from which the money came, shortly after learning that one Childs was engaged in their construction, they notified him in writing Jan. 1894 (which was some two or three months after the commencement, and about three months before the completion of the houses) that the work was done without their authority, and that he would be held liable as a trespasser upon their premises; and further that it was not until February 1895 that either of them learned of the advances made by the association, or of the deed of trust of the property held by it.

Although there is no evidence contradicting either of these denials, nor of actual knowledge possessed by the defendants of the matters thus denied, still it seems to me there is evidence in the record that facts might readily have been ascertained by them from which they might well have learned at an earlier time, of the building, and of the source from which the money employed was derived.

Recalling their former experiences with Walter and Bradshaw in the erection of the brick shanty on these lots; their forcible defense of that building, and their possession and enclosure of the lots, with their subdivision by Walter, the defendants under their conviction of the illegality of the means by which they had been thwarted in the obtention of their rights by Walter and his associates might well have assumed that any similar practices respecting the property should be ascribed to the same parties. The slightest inspection would have shown that before their notice to Childs the excavations and buildings were in progress on their lots; and the land records would have disclosed the numerous conveyances of the lots, all suspicious in their appearance, which

culminated in the deed to Bradshaw and his deed of trust to secure the association for the large amount of $20,000 named therein; all of which must have been printed and generally read by business people, in the register of conveyances published every week day.    If the defendants knew nothing of all this, they were probably only of the small minority of business men who had not observed it.    I, therefore, think knowledge of these conveyances and of the deed of trust to the association at earlier dates than those assigned in the answer must be imputed to the defendants.

Whether the possession of such knowledge imposed upon them the duty, from charitable or equitable motives, of warning the association, after it had received the deed of trust, that it had made an unfortunate bargain, is another matter.    If the land belonged to other people, clearly the defendants were under no obligation, in the philanthropic spirit, to intermeddle with the business.

But the buildings and the conveyances concerned the property of the defendants, and although, *strictissima juris,* they might await the consequences of another man building his houses on their land, yet it would have been better, at the earliest period when they learned of the trespass, to have notified the aggressor that he would be held answerable for the wrong.

Has the complainant been injured by the delay of the defendants to give this notice to the builders in the intervening time, between October 1893 and January 1894?   I think not.   The association, with its eyes open and really with full constructive notice and through its agent, as I find, and with the equivalent of full actual notice, had deliberately entered into this agreement binding itself to pay the instalments; and had agreed to advance more than one half the $20,000, within a few days after the deed of trust was recorded.   If the defendants had given notice of their adverse title as soon as the notice of the building permit of the 20th of November 1893 was published in the newspapers; or even in the last of October when the deed of trust was recorded, they would thereby have imparted no information not already imputable to the association.

3. The contention of the complainant association, that the de-

fendants had such early notice of the commencement of the houses and that the money was furnished by the complainant, that, if the defect in Bradshaw's title had at that time been communicated to the association, it could have saved itself from loss by withdrawing from its bargain with Bradshaw; and that as the defendants neglected to communicate this information to the association and in silence watched the expenditure, therefore equity should decree a lien upon the property for the benefit of the association,—is predicated of the postulate that the person thus laying out the money was a bona fide holder or purchaser, *without notice of any defect in his title.*

Under such conditions, *when the real owner seeks the aid of equity to establish or enforce an equitable claim* to the property, the courts will require him to make compensation for the amount expended on improvements to one who has laid out his money innocently and in good faith, supposing himself to be the owner, upon the principle *that he who seeks equity must do equity.* But it is part of the principle itself that the rule is otherwise where the person making the improvements had knowledge of the true state of the title.    Such is the statement of the doctrine in 19 Eng. & Am. Enc. of Law, pp. 20–'1 cited by the complainant's counsel.    And it is also settled by the weight of the authorities that the courts will not interfere to grant *active relief* to a bona fide purchaser, who, without notice of the true state of the title, has made permanent ameliorations and improvements, if he brings such suit in equity against the true owner after the latter has recovered the property at law.

Such was the undoubted understanding as to the state of the law, in England and in this country and it was thus explicitly laid down in 2 Story's Equity Jurisprudence § 1237 from the earliest edition, including the third edition published under Justice Story's imprimatur, in 1843.

But at the May term 1841, Mr. Justice Story then sitting alone in the case of *Biggs* v. *Boyd* (1 Story C. C. Rep.) expressed a strong doubt as to the propriety of this distinction and declared he would give *active relief* at the application of the evicted purchaser.    The opinion must have created great aston-

ishment when it became known, which was on the publication of the fifth edition of his Jurisprudence more than ten years after the death of Judge Story. However strong may have been his language, it was at best but the decision of a single judge against the undoubted decisions of all the great courts before it was made.

In 20 Howard 538, *Williams* v. *Gibbs,* decided in 1857, the Supreme Court adheres to the former statement in the earlier editions of Story which are quoted in the opinion.

In 111 U. S. 66, *Canal Bank* v. *Hudson,* decided in 1884, there is no indication of any change in the opinion of the court, although the opinion cites the unchanged text of Story, § 237 in connection with case of *Bright* v. *Boyd,* 1 Story C. C.; showing the court had observed the departure in the latter case from the ancient doctrine and refused to be governed by it. And in 133 U. S. 561, Chief Justice Fuller adheres positively to the ancient text of Story, and makes a citation from it, almost in *totidem verbis.*

In our courts, 1 MacArthur 217, *Sheldon* v. *Prather,* Mr. Justice Wylie cites the rule in the old form of words with approbation; and the decision of the court of appeals in 14 Appeals, 54, *Anderson* v. *Reid,* is a positive declaration of its intention to be governed by the important and ancient statement of the doctrine, as given in the original text of Story.

I have no doubt whatever that this decision in the last-named case, sustained as it is by the unbroken authority of the Supreme Court and numbers of other authorities, fully justifies my decision and decree.—REPORTER.]

*Mr. George H. Lamar* and *Mr. Blair Lee* for the appellant.

*Mr. J. J. Darlington* for the appellees.

Mr. Justice MORRIS delivered the opinion of the Court:

In disposing of this case we might well, perhaps, adopt the excellent opinion filed in it by the learned justice who heard it in

the court below. That opinion is thorough and elaborate, and satisfactorily disposes of all the questions raised by the record. It will be proper, however, to notice some of those questions and to state in our own way our views of the law which we think govern them.

In the case of *Anderson* v. *Reid,* 14 App. D. C. 54, we held, after a full and careful review of all the authorities on the subject, that an occupant of land, who has entered upon it in the honest belief that it is his own and who has in good faith improved it, is not entitled, after having been evicted by the true and lawful owner, to claim an equitable lien for his improvements against such true and lawful owner. And if an occupant who improves in good faith is not entitled to such equitable lien, it is difficult to see how one who supplies him with money for the construction of the improvements can stand in any better position than he does. Fortunately, as we think, and in the interest of equity and justice, the rule stated in the case of *Anderson* v. *Reid* has now, at least to some extent, been modified by the Code, in § 1003, of which something like the more equitable provision of the Roman civil law is introduced into our jurisprudence. But the present suit is not affected by this provision of the Code.

If an occupant in good faith was not entitled to an equitable lien for improvements, one acting in bad faith certainly is not so entitled; and it must be conceded, of course, that in the present instance Bradshaw was an occupant in bad faith with the fullest possible notice of the right and claim of the appellee. Nor can it be supposed that the grantee of an occupant in bad faith can have any better right than his grantor had.

The contention on behalf of the appellant, however, is that, because Bradshaw was in bad faith, and the appellees knew it, and yet failed to notify the appellant or rather the association in whose place the appellant now stands, therefore, they are responsible in this suit. But it is difficult for us to see wherein there was any legal duty imposed upon the appellees to warn the association against the consequences of its own improvident and inconsiderate action and the fraud perpetrated upon it by

its own agents. The appellees aver that they had no actual knowledge of the association, or of the source from which Bradshaw derived the money for the improvements, until a year after that money had been advanced to Bradshaw and the improvements had been constructed; and this statement is not controverted. Indeed, actual knowledge of this fact, or of the connection of the association with the land in any manner is not claimed on behalf of the appellant. The claim is that the appellees had constructive notice from the record of the mortgage or deed of trust given by Bradshaw to the association, and therefore, that it was the duty of the appellees to seek out the association and to warn it that Bradshaw's title was not good, and that they themselves had the title to the land.

This we must regard as a most extraordinary contention, and an unreasonable application of the doctrine of constructive notice. Constructive notice does not mean anything of this kind. One is not required to take notice of everything which is put upon the records of the land office, even concerning his own property. One who has acquired title is entitled to rest upon his rights; nothing afterwards put upon record, otherwise than by himself or by his procurement, can legally affect those rights. One who deals with land is required to take notice of all conveyances on record at the time at which he deals with it; but it would be absurd to hold that he is required to take notice of any and all documents that might be placed upon record afterwards by irresponsible persons with whom he has no connection.

Nor is the contention entitled to any greater consideration that the appellees in some way became liable to the association because the clerk of the court failed to make a certain index or a certain marginal memorandum as full as it might have been made. The appellees were not responsible for the manner in which the clerk kept that index. They had no control over it. Nor does it appear even to have been a record required by law to be kept by the clerk. The marginal memoranda at the head of the pages of the docket which contained the entries of their several suits were equally beyond their control. They or their attorney accomplished all that was required of them

when they delivered their papers to the clerk, and those papers were filed, and a memorandum of the filing was entered by the clerk in the docket. The marginal references were matters wholly extraneous, and competent examiners of title could scarcely be content to rely upon them without examination of the papers filed.

It is true that it has been held that, when a document such as a deed is required to be recorded, and the record in law takes the place of the original document, and the recorder fails to transcribe the document correctly, so that one who afterwards deals with the property is misled by the recitals in the record, the parties in interest are bound by the record rather than by the original deed (*Frost* v. *Beekman,* 1 Johns. Ch. 288). But nc such case is presented here. There is no record of a declaration or amended declaration other than its filing. The original paper itself becomes the record and speaks for itself; and he who would accurately know its contents must have recourse to the document itself, and not rely upon any marginal note.

We are unable to find any ground in the record to justify the intervention of a court of equity in favor of the appellant. The association, for which he sues, appears to have been the victim of its own improvidence and of gross fraud perpetrated upon it by its own agents and those with whom it dealt, without connivance, concurrence, or knowledge of any kind on the part of the appellees, whose conduct throughout appears to have been fair and reasonable, and whose pending ejectment suits gave the fullest possible notice to all the world of their claims in the premises.

We are of opinion that the decree of the Supreme Court of the District of Columbia should be affirmed, with costs. And it is so ordered.                    *Affirmed.*