WILLIAM S. BRYAN, JR·, Executor, vs. JAMES B. COUNCILMAN. ET. AL.

*Compensation for Improvements Made by Wife on Husband's Land.*

When a wife expends her money in making improvements upon land to which she does not claim title, but which she knows is the property of her husband, she has no lien on the land for the value of such improvements.

*Decided June 26th, 1907.*

Appeal from the Circuit Court for Baltimore County (Burke, J.)

The cause was argued before Briscoe, Boyd, Pearce, Schmucker and Rogers, JJ.

*Edgar H. Gans* and *William S. Bryan, Jr.* (with whom was *D. G. McIntosh* on the brief), for the appellant.

*Edward N. Rich* and *E. L. Painter*, for the appellees.

Rogers. J., delivered the opinion of the Court.

This is an appeal from the Circuit Court for Baltimore County in equity.

On September 24th, 1902, Sadie C. Councilman filed her bill of complaint in the Circuit Court for Baltimore County against her husband James B. Councilman, his brothers and sisters and the Safe Deposit and Trust Company.

In this bill she alleged that her husband took, under the last will of his late uncle James B. Councilman, of Baltimore County, a large and valuable estate known as Woodhome.

The bill further alleges that after her marriage Mrs. Councilman advanced to her husband large sums of money to be used in the improvements of Woodhome, in the belief that her husband possessed that property in fee simple; that these

sums were expended on Woodhome; and that thereby the vendible value of that estate was very greatly increased— among other improvements a number of cottages and other buildings having been erected on that estate.

Subsequently to these advances and improvements differences arose between Mrs. Councilman and her husband, and at the time of the filing of the bill they were living separate and apart from each other.

The bill then alleges that since the expenditure of these sums of money on Woodhome by her, on the theory and belief that the same was owned in fee simple by her husband, and under the promise by him to secure her for such advances, by a lien on this estate, she has learned that there is a doubt as to whether under the proper construction of the will of the late James B. Councilman, Woodhome belongs absolutely to her husband, or whether there is a contingent or expectant interest in Woodhome possessed by the heirs apparent of her husband—these heirs apparent being his brothers and sisters.

The bill then states that on October 1st, 1900, her husband executed and delivered to her a mortgage of all his interest in Woodhome and all the live stock and crops upon it, to secure the sum of $72,500. This mortgage recites as follows:

"Whereas, Sadie C. Councilman, wife of the said James B. Councilman, did heretofore advance and pay out large sums of her own money for the purpose of and in making, erecting, rebuilding and repairing certain buildings, cottages and other improvements on certain real estate belonging to or in which the aforesaid James B. Councilman had a life estate or certain other interests, and especially on that tract of land known as 'Woodhome Farm,' situated in the Third Election District of Baltimore County; and

"Whereas, it was agreed by the parties hereto at and prior to the time the said money was so advanced or paid out, that the repayment of the same to the said Sadie C. Councilman should be secured by a lien on or a deed for the property on which said buildings, cottages and improvements were made,

erected or repaired, and the sum so paid out and advanced by the said Sadie C. Councilman did, on the 2nd day of October, 1899, amount with interest to the sum of seventy-two thousand five hundred dollars, and the said James B. Councilman did, on the 2nd day of October, 1899, make and deliver to the said Sadie C. Councilman his promissory note for the said sum payable on demand, and the said note so delivered did contain an agreement on the part of the said James B. Councilman to transfer to the said Sadie C. Councilman, as security for the payment of said note, all right and interest the said James B. Councilman should own or hold in and to any real or personal property, whenever the said Sadie C. Councilman should demand the same, and the said Sadie C. Councilman has prior hereto demanded that the said James B. Councilman perform the agreement set forth in said note and make the transfer therein provided for."

The record shows that on April 30th, 1902, Mr. Councilman obtained a further loan of his wife for $13,000.

The record further shows that Mr. Councilman left the estate owing a number of debts.

The bill then prays for the appointment of a receiver, that she may be decreed to have a lien for betterments on the estate of Woodhome, that the estate be sold to satisfy her lien for betterments and her mortgage debt and for general relief.

A copy of the note of October, 2nd, 1899, is as follows:

Mt. Wilson, Oct. 2, 1899.

"In consideration of my wife, Sadie C. Councilman, having expended her own money in erecting five houses, two stables, water tower, water works, gas machines, digging artesian well, rebuilding and repapering and refurnishing the main dwelling and overseer's house and erecting an ice house on my property known as Woodhome Farm, Mt. Wilson, Md., in which I have life estate, and wishing to protect her in this large expenditure of her money, as it was agreed on my part between her and others that I should do so, I hereby, on this 2nd day of October, 1899, do promise to pay to the said Sadie C. Councilman, on demand, the sum of seventy-two thousand

five hundred ($72,500) dollars, for value received, with interest, and hereby also promise to transfer to her all right and title to any real, personal or mixed property that I may own or hold whenever she should so demand it as an additional security.

Witness                              . J. B. Councilman."

W. B. Schwartz.

The Circuit Court passed an order appointing the Safe Deposit and Trust Company receiver.

Mrs. Councilman died in May, 1906, and Mr. Wm. S. Bryan, Jr., as her executor, was made party plaintiff in her stead.

On March 18th, 1907, the Court below passed the following decretal order:

This case coming on to be heard and the counsel for all the parties in interest having been heard, and the proceedings having been read and considered, and the counsel for the plaintiff having asked the Court to decree a lien by way of betterments and upon the property mentioned in these proceedings, it is, thereupon, on this 18th day of March, 1907, by the Court here ordered, adjudged and decreed that William S. Bryan, Jr., executor of the late Sadie C. Councilman, has under proof of this case no lien by way of betterments binding upon the fee simple interest in the property mentioned in these proceedings. The determination of the rights of the executor of the late Sadie C. Councilman under the mortgage executed by James B. Councilman to Sadie C. Councilman and filed in these proceedings is reserved for the future action of the Court." And from this decretal order the appeal in this case is taken.

Let us examine the record in this case and find out from it the true position of this complainant. On page 176.

7th Ques. & Ans. It was my home and I put my money there with that intention. I put the money there when I was married and the whole time ten years; everything he wanted, I let him use my money just the same as if it belonged to him.

14th Ques. And the money was put there when?

Ans. All along, when I first went there $18,000 in house and $20,000 in other houses beside the other improvements.

15th Ques. And you put this money there when?

Ans. When I was first married to him ten years before.

18th Ques. Can you tell us whether or not you would have put your money in the improvement in that place or have permitted it to be put in the improvement if you had not believed it would be yours and your children?

Ans. I never thought of any lien and never thought other than that it was his and had that impression when I married him and supposed his uncle left it to him absolutely. That was what I understood.

25th Ques. What I want to get at is not what was said by his brother or anybody else at the time of the Milk Producers but what Mr. Councilman said at or before the time when the money was put in, to induce you to put money in?

Ans. Of course all through my married life; it was natural for me to say to him that there was a great deal of money being spent on the property and he said you derive the benefit of it; it is very valuable and will come to you and that satisfied me, and as I said, it was my home, was to be my home all my life as I thought.

26. And when I put my money there I thought it was for my benefit and my children and that is all I can say.

Mr. J. W. Marshall.

23. James B. Councilman said that his wife knew to the contrary that is my recollection.

34. He, Councilman, told me that he had told his wife that he only had a life interest in her presence, but she denied it.

12. When improvements were made at Woodhome, Mrs. Councilman before we were married, came up there a great deal driving with her aunt during the summer and fall, and she would drive up to Woodhome and looked over the house and wanted to make a great many improvements, I told her I had not the money, and it was a first rate house and substantially built and no reason why it should be improved, the only thing it needed was a new roof which I intended to put

on; she said her grandfather's estate had been settled up and this was to be her home and a home for her children and she wanted to spend the money herself, and she would not live in there the way it was and she insisted and put it in such a way that I allowed her to spend the money and saw Mr. Cowan and he agreed to make the improvements for $5,600 and the plans were satisfactory to her and I submitted them to her at her house 1733 Linden avenue.

13th Ques. Before you were married?

Ans. Yes.

14th Ques. Long before you were married?

Ans. Just about the time we were married.

15th Ques. State whether plans were followed?

Ans. Yes until she started to come out there herself and then she saw a great many things she wanted done; I tried to keep her away because I knew when you start to make improvements they run on and you don't know what the expense will be. She saw the staircase which was a fine mahogany staircase and she insisted on Mr. Cowan making plans and afterwards had some plans made here in the city.

17th Ques. What was the condition of the old staircase?

Ans. Perfectly good in every way, built of the best material. I protested in every way I knew how but she persisted in doing it and she did not only do that, the old porch was taken down and another one put up, the old one was smaller than the one she put there, but she insisted on having it done, and another improvement she made was, she went in the second story and she seemed to think the ceiling was low; the ceiling was 8 feet or 8½ and she had it raised to ten feet, and then she came out there and saw there was a room in the third story that she wanted to make a sort of wardrobe out of,   *   *   *·

23rd Ques. What was the general character of the work done by Mr. Cowan, was it work that was necessary to preserve the property?

Ans. Not at all; the house only needed a new roof on it, that was the only thing necessary to preserve the property;

the balance was done entirely for the gratification of Mrs. Councilman.

24th Ques. In the account of Mr. Cowan's filed in this case there is a charge of $22,375.00 for building five cottages, and the date of charge being July 1st, 1894, state what you know about building those cottages, how did the idea or purpose first originate and by whom?

Ans. The idea first originated with Mrs. Councilman, her brother Dickson C. Walker built a house which is occupied by Mr. Wm. C. Painter and she would go over there and speak about building these cottages, because it would be such a good thing to have cottages to rent and her brother thought so too and she consulted Mr. Newcomer, president of the Safe Deposit Company, and he thought it was an excellent thing, and I think Mr. Marshall also thought so; she had lots of money lying around that was paying low rates of interest, some of it in stocks that was paying low rates of interest; I was very much opposed to it and told her she had spent enough money on the place and she had better keep the money separate; but she insisted on doing it and said she was going to do it and I did the best I could of talking her out of building the cottages; the money at first with which she was to pay all the bills— she had an account in the Western National Bank and she commenced to pay the bills herself and draw the money herself but she soon got tired of it, being unused to it, and said she could not bother with it and turned the money over to me and as the bills of Mr. Cowan would come due, I would pay him.

25th Ques. Did you have any conversation with Mrs. Councilman at any time before these cottages were built in reference to the title that you held to the Woodhome estate?

Ans. Yes, often times.

26th Ques. Can you remember any particular occasion?

Ans. Yes; I remember one time particularly; this particular time was we had been talking of Wyatt & Nolting, architects of the Dixon Walker house and thought it a good thing to get Mr. Wyatt & Nolting to look over the ground and see

about locating the houses; Mr. Nolting was away, she pre-
ferred him but as he was away, Mr. Wyatt came out in his
place and I drove her down to the woods where the cottages
were to be located to meet Mr. Wyatt, and we talked about
the place at the time and I told her that, I remember distinctly
about telling her about the property being left to me during
my life-time with power to will it to whom I choose; I believe
this is the language, "To dispose of it by will duly executed";
she said that is all right, you have already made a will, leav-
ing it to me and I said yes, I left her every cent of this property,
which can be shown or proven; she said that was all that was
necessary and all that she wanted.

It would serve no good purpose to go further into a detailed
recital of the testimony, it is sufficient for the purposes of this
opinion to say, that the record discloses a very unfortunate
and distressing state of affairs.   Now from the facts recited
above what conclusion can be reached save that Mrs. Council-
man being possessed of ample means set about improving as
she thought the estate of her husband.   Which as she says in
her testimony she supposed would be a home for herself and
children.   Did she occupy such a relation as the law requires
to make her a creditor of this estate.   The appellants have
pressed upon us the well recognized principle of compensation
for improvements made upon another's property.   Now to en-
title the party claiming to a standing even in a Court of equity
there must be three concurrent esssentials.

1. He must have held possession under color of title.

2. His possession must have been adverse to the title of the
true owner.

3. He must have acted in good faith.   16 *Am. & Eng.
Ency. of Law*, 79–83.

Again—As a general rule in order that one may recover
compensation for improvements made on another's land, it is
necessary that he should have made such improvements in
good faith, while in *bona fide* adverse possession of the land
under color of title.   *Cyc. of Law*, vol. 22, pages 15–16.   By
good faith is meant an honest belief on the part of the occu-

pant that he has secured a good title to the property in question and is the rightful owner thereof. And for this belief there must be some reasonable grounds such as would lead a man of ordinary prudence to entertain it. 16 *Am. & Eng. Ency. Law*, 85–6.

In *McLaughlin* v. *Barnum*, 31 Md. 454, JUDGE MILLER delivering the opinion of the Court, uses this language: "All that is required to entitle a defendant to claim this equity is that he be a *bona fide* occupant or possessor, and not a mere *tort feasor* or *mala fide* intruder, holding with full knowledge of his own position and of the adverse claim." The Supreme Court, in *Green* v. *Biddle*, 8 Wheat. 79, have defined a *bona fide* possessor, according to the doctrine of the civil law, to be one "who not only supposes himself to be the true proprietor of the land, but who is ignorant *that his title is contested* by some other person claiming a better right to it." *Judge Story Equity Jurisprudence*, sec. 799, "if a plaintiff in equity seeks the aid of the Court to enforce his title against an *innocent* person who has made improvements on lands, *supposing himself to be the absolute* owner, the aid will be given to him only upon the terms that he shall make *due compensation* to such innocent person to the extent of the benefits which will be received from these improvements." So in the case of a mortgagee, thinking *himself absolutely entitled*, expends considerable sums in repairs and lasting improvements, he will be allowed such expenditures." *Jones* v. *Jones*, 4 Gill 87; *Hagthrop* v. *Hook*, 1 G. & J. 305; *Smith* v. *Townsend*, 27 Md. 368; *Foley* v. *Kirk*, 33 N. J. Eq. 170.

Chancery, borrowing from the civil law, made the first innovation upon the common law doctrine. And it came at length to be held in equity, that where a *bona fide* possessor of property (for equity no more than the law would aid a *mala fide* possessor) made meliorations and improvements upon it in good faith, and under an honest belief of ownership, and the real owner was for any reason compelled to come into a Court of equity, that Court applying the familiar maxim that he who seeks equity must do equity and adopting the civil law rule of

natural equity would compel him to pay for these improvements. 16 *Am. & Eng. Ency. Law,* 67.

And so JUDGE ALVEY in *Long* v. *Long,* 62 Md. 75, says, "Being innocent *bona fide* holders and possessors of the property in controversy, supposing that they held a good and sufficient title thereto by virtue of a judicial sale, will be entitled, upon well established principles, to a proportionate allowance for the value of all beneficial permanent improvements of the property, according to its improved condition."

In all of these cases it will be observed that the parties to whom relief was granted were *bona fide* possessors of the premises. But in this case Mrs. Councilman must have known that this property upon which these buildings were erected, did not belong to her; nor had she reasonable grounds for supposing or believing that it did. She made these advances to serve herself, not for the benefit of these appellees and we think she has no valid claim for moneys thus expended. We have been requested by the council for appellant to express our opinion upon the question as to what title or interest Jas. B. Councilman took in Woodhome under the will of his uncle, but as we have decided that the appellant has no claim for betterments; and as the question of Jas. B. Councilman's interest or estate was not passed upon by the learned Judge below who heard the case, any view we might express would be merely *obiter dictum,* we will refrain from acceding to said request.

It follows from what we have said that the decree below must be affirmed.

> *Decree affirmed with costs to the appellee above and below.*