ETHERINGTON *v.* BAILIFF.

1. REFORMATION OF INSTRUMENTS—VERDICTS AND FINDINGS—EVIDENCE.
    Finding of trial court that parties had intended to purchase tract as specified in reformed deed, *held*, supported by evidence.

2. SAME—EVIDENCE—BOUNDARIES.
    A conveyance of real estate may be reformed, where, through

REFERENCES FOR POINTS IN HEADNOTES

[2]  45 Am Jur, Reformation of Instruments § 38.
[3]  45 Am Jur, Reformation of Instruments § 93.
[7]  19 Am Jur, Equity § 483.
[9, 10]  27 Am Jur, Improvements § 8 *et seq.*
[9, 10]  Action to recover for improvements made on land by one who mistakenly believed himself the owner.  104 ALR 577.

error, it fails to express the result of the meeting of the minds of the parties as to boundaries, particularly when it is clear that the description fails to embody the clear, undisputed visual standard of the parties.

3. SAME—PARTIES—BOUNDARIES OF OTHER PARCELS.

Reformation of deeds as to parcels of land plaintiffs had sold to others than defendants and prior to the sale to defendants is not made even though descriptions in other deeds relate to same erroneously located corner, where such grantees are not parties to instant suit, although boundaries between plaintiffs' and defendants' property and such other properties are inevitably affected.

4. APPEAL AND ERROR—QUESTIONS REVIEWABLE.

The Supreme Court cannot adjudicate questions relating to boundaries that are not before it for consideration.

5. SAME—VERDICTS AND FINDINGS—CHANCERY CASES—RECORD.

Great weight is accorded findings of the trial court in a suit for reformation of instruments, where it is impossible to determine from the record what the true facts are, since he had the opportunity to see and hear the witnesses firsthand.

6. BOUNDARIES—ESTOPPEL—REFORMATION OF INSTRUMENTS—FINDINGS OF TRIAL COURT.

Finding of trial court that plaintiffs were not estopped from contending that standard which should be used in measuring the holdings of the respective parties was the visual one set out by them previous to delivery of the deed of which they now seek reformation, where it appears that defendants had moved their buildings onto disputed land in reliance upon a survey which they had had made rather than upon any act, representation or admission of plaintiffs.

7. EQUITY—MAXIMS.

A loss must be borne by the party whose conduct has rendered the injury possible, where 1 of 2 innocent persons must suffer loss.

8. REFORMATION OF INSTRUMENTS—DAMAGES—EXCAVATION—MOVING BUILDINGS ONTO DISPUTED LAND.

Defendants are required to stand loss due to excavation and cost of moving small buildings from area disputed in suit for reformation of deed and awarded to plaintiffs, where they had dug basements and moved such buildings onto the

area without permission from plaintiffs and not in reliance upon any act, representation or admission of plaintiffs.

9. IMPROVEMENTS—RECOVERY OF VALUE FROM OWNER.

One who places improvements on the land of another is not entitled to recover the value thereof unless he did so while in possession under color of title, had possession adverse to the title of the true owner and acted in good faith.

10. SAME—BONA FIDE POSSESSION.

One who makes improvements on the land of another is not a bona fide possessor of such land, where he knows his title thereto is contested by some other person claiming a better right to it.

11. REFORMATION OF INSTRUMENTS—IMPROVEMENTS—VALUE.

Defendants in suit for reformation of deed who excavated a basement and moved small buildings onto disputed piece of land when they knew plaintiffs contested the title thereto were not entitled either to have an award for the value of the improvements as determined by the court or to have the value of the land determined and be permitted to pay plaintiffs such value and take possession.

Appeal from Arenac; Shaffer (John C.), J. Submitted July 2, 1952. (Docket No. 19, Calendar No. 45,312.) Decided October 6, 1952.

Bill by Henry Etherington and wife against Royal Bailiff and wife to reform a deed. Decree for plaintiffs. Defendants appeal. Affirmed.

*Dennis J. O'Keefe* and *Harry E. Converse,* for plaintiffs.

*Herbert Hertzler,* for defendants.

BUTZEL, J. Plaintiffs, Henry and Mary Etherington, in 1934 acquired 40 acres of land in the township of Au Gres, county of Arenac, State of Michigan, to-wit:

"Southwest quarter of the northwest fractional quarter of section 18, town 19 north, range 6 east."

At the time of purchase, plaintiffs and their grantors inspected the property with the aid of a Mr. Baikie, who was not a surveyor but supposedly familiar with such matters, being county drain commissioner. The 40-acre parcel is bounded on the west by State Highway M–65 and on the south by US Highway No 23, and it is conceded that the true west quarter post of the section is found at the intersection of the 2 highways. Locating such post, Mr. Baikie measured east from it along US–23 for a distance of 1,484.34 feet to what he believed to be the southeast corner of the parcel. The parties there placed a stake 75 feet north from the center of the pavement. We shall refer to this hereinafter as the Baikie stake.

On July 3, 1940, plaintiffs, desiring to sell 100 feet of frontage on US–23 at the southeast corner of the forty to Faye E. Castonguay, again went on the property, and measuring from the Baikie stake, chained along the highway to a point 100 feet west thereof where they placed another stake denoting the southwest corner of the Castonguay property. We shall refer to this as the Castonguay stake. The right-of-way of the Detroit & Mackinac Railroad runs through plaintiffs' land some 1,100 feet north and parallel to US–23, and it was understood that such right-of-way would constitute the northern boundary of the Castonguay property. The deed to the Castonguay parcel read as follows:

"Commencing at the SE corner of the SW 1/4 of NW 1/4 of section 18, town 19 north, range 6 east, thence 1,100 feet north, thence 100 feet west, thence 1,100 feet south, thence east 100 feet to beginning."

It will be noted that the Castonguay deed was given with reference to the southeast corner of the forty, not with reference to the established southwest quarter post or to the Baikie stake. The Castonguays

took without further survey and so far as can be ascertained from the record they have considered their property lines to be properly set out in relation to such stake.

Members of the family of Royal and Lottie Bailiff, defendants herein, having purchased land from plaintiffs in the southwest part of the forty, defendants were desirous of buying 200 feet of frontage adjacent to the Castonguay property. Early in March of 1942, both of plaintiffs, defendant Royal Bailiff and his father, Clarence Bailiff, went to the property for the purpose of marking out such plot. Just what happened at this time is disputed. Plaintiffs testified that the parties measured 100 feet from the Baikie stake as a means of locating the Castonguay stake, then chained 200 feet west from the Castonguay stake and placed a similar stake and a root at that point; that it was understood that the property would run as far north as the Castonguay property, that is, to the railroad right-of-way. Royal Bailiff, on the other hand, testified that he saw no actual measurements being made (although Clarence Bailiff and plaintiffs may have made some); that he observed no stakes; that his intention was to rely upon the description in the deed given him. A later statement made by the same witness indicates that he was actually aware of the existence of stakes, but he consistently stated his property was bought subject to a correct survey. Plaintiffs had stated that if a survey was to be had, defendants would have to pay for it. Clarence Bailiff also testified that the parties were unable to find the Baikie stake; that they measured instead from the southwest corner of plaintiffs' forty, bordering on State Highway M–65 to the southeast corner and then back to the property in question; that although some measurements were taken, the land being cheap (the 200 foot frontage sold for $50) the parties did not pay much attention

to the measurements, just understood that the southwest corner of defendants' property would be 300 feet from the southeast corner of the forty, and determined with reference to it. The parties having examined the property, the deed thereto was executed on March 16, 1942, and read as follows:

"A piece of land commencing at a point 100 feet west from the southeast corner of the SW 1/4 of NW 1/4, section 18, T 19 N, R 6 E, thence 1,100 feet north, thence 200 feet west, thence 1,100 feet south, thence 200 feet east to point of beginning."

It will be noted that the property was again described with reference to the southeast corner. At the time of the deed, there were no structures on the Castonguay property to indicate the location of the Castonguay west line, other than the aforementioned stake. No effort was made at that time to locate the northeast and northwest corners of defendants' parcel.

Between 1942 and 1948, defendants' parcel and the Castonguay parcel were improved and ditches and fences were established in accordance with the stakes set out by the plaintiffs. At no time was the location of the parcel questioned. However, in 1948, defendants contemplated the building of an onion storage warehouse and before undertaking such project had their property surveyed. The surveyor, Mr. Cooke, found by his calculations that the true southeast corner of the property was 146 feet west of where Mr. Baikie had supposed it to be in relation to the west quarter post. The result of the survey, if followed, would be to move all previously established property lines which had been set up in relation to the southeast corner 146 feet west of where they had been supposed to be, and defendants would thus be entitled to 146 feet of the frontage plaintiffs had supposed to be theirs.

On being informed of the results of the survey, Mrs. Castonguay stated that she would take no action. Evidently the State of Michigan, which owns the forty adjoining the Castonguay piece has likewise taken no action. Defendants, however, have consistently sought to establish the survey as the true one.

On April 18, 1948, defendant Royal Bailiff took the results of the survey to plaintiffs and expressed to them his intention of relying thereon and having his house moved on the disputed strip. What was said during the rest of the conversation is in dispute. Royal Bailiff states that plaintiff Henry Etherington said that the survey was all right if Cooke did it, as he was one of the best surveyors around, that he would hurry to move his cabins off the disputed strip, and made no objection or statement that he would contest the survey. Etherington, however, testified that he said that something must be wrong; that he would look into the property situation and have it surveyed; that he did not agree to the moving of defendants' buildings; that he stated he would hurry and move the cabins only if he found out the survey was right. He also introduced impartial testimony that he had contemplated moving the cabins as early as 1946 and hired a contractor to move them in March, 1948, before the Cooke survey, so that his subsequent removal of them was not as a result of the survey.

Soon thereafter, Etherington went to Cooke and asked about a survey to be made of the whole property, but for some reason proceeded no further with one. He then had Mrs. Castonguay, an employee of the State conservation department, try to obtain information in regard to the true property line. He delayed for some time waiting for word through her, then, evidently feeling there was no way to avoid the larger expense of a survey, arranged to have the

property surveyed in September of 1949.

In the meantime, defendants had moved quickly to take possession of the disputed strip. Plaintiffs' cabins were moved sometime between April 28 and April 29, 1948, and about the same time basements were dug for both defendants and plaintiffs. Plaintiffs contend that they knew nothing of the basement defendants proposed to build on the disputed area. Defendant Royal Bailiff testified that soon after the discussion of the survey, they discussed the 2 basements; but plaintiff Henry Etherington testified that on April 28th he went to see the progress of his basement at which time no basement had been dug for defendants.

Just which basement was dug first would seem to bear on the question of notice. The excavator was paid by plaintiffs for their job immediately before it was fully completed (April 28, 1948), and by defendants after their job was done (April 30, 1948). However, he was unable to testify as to which basement was dug first. Mr. Swartzentruber, who moved the cabins at this same time, positively testified that plaintiffs' was dug first.

Plaintiffs testified that, for a number of reasons, they did not pass defendants' property again until the 11th of July, inasmuch as they were living some distance away at the time. On their return from Canada at this time, they also noticed that defendants had moved their house and outbuildings during June and begun construction of the onion storage warehouse. Defendants claim that plaintiffs made no objection to the buildings on their return; plaintiff Henry Etherington attributes this to his reluctance to argue. A postcard sent from Canada to defendants was introduced in evidence and would indicate that plaintiffs still believed in early June that a solution of the boundary difficulties could be reached to their satisfaction, and adds credence to

the claim that they did not know of defendants' actions. Plaintiffs themselves commenced their home in August and finished building it that year. No building has been done after 1948 to the present on or near the disputed property.

The Holmes survey, which was completed for plaintiffs on May 1, 1950, indicated that there was only 24.33 feet of overlap from the true southeast corner. Soon thereafter, on May 22, 1950, the parties tried to reach an amicable settlement of their disputes but failed. There is testimony that at a conference, although defendants admitted the existence of the stakes, they claimed they took the land pending a survey and not in relation to any stakes.

On September 2, 1950, plaintiffs filed their bill of complaint asking for reformation of the 1942 deed to conform with what they believed the intention of the parties to be at the time of sale. They did not introduce the Holmes survey and at no time on trial or appeal have attempted to rely on it. Defendants introduced the Cooke survey and in addition argued that plaintiffs are now barred by equitable principles from asserting title to the disputed strip. On May 26, 1951, the court decreed reformation of the deed so that it should read in accordance with the original measurements from the west quarter post, as follows:

"A piece of land commencing at a point 1,184.34 feet east of the west quarter-post of section 18, T 19 N, R 6 E, thence north 1,100 feet, thence east 200 feet, thence south 1,100 feet, thence west 200 feet to point of beginning, excepting therefrom" (right-of-way, et cetera).

It also decreed that defendants be given 60 days in which to remove their buildings from all other properties.

Defendant admits that his property was "pointed out" to him and that he surrounded his property with ditches and fences generally in accordance therewith. That there were stakes of some kind is also indicated by the testimony. It was also understood as to the total area to be sold, and that it was to be adjoining the Castonguay piece of property. The trial court seemed to feel that there was sufficient evidence that the parties intended to purchase the tract now specified in the reformed deed. We believe this is the most logical conclusion from all of the testimony.

Although defendant claimed he had no idea of his side boundaries, it is difficult to believe he built fences and ditches without such an idea. It is true that no side boundaries were indicated but it would appear that they could be determined easily from the deed, knowing the railroad right-of-way to be the northern boundary, and the highway to be the southern boundary, and determining the southwest and southeast corners of the parcel and measuring due north to the right-of-way. We fail to see how failure to specify a northeast or northwest corner in view of the other provisions of the deed could be an obstacle.

There is abundant authority for reforming a deed or mortgage which, through error, fails to express the result of the meeting of the minds of the parties, particularly when it is clear that the description fails to embody the clear, undisputed visual standard of the parties. *In re Moore's Estate,* 292 Mich 198 (7 NCCA NS 332) ; *Farabaugh* v. *Rhode,* 305 Mich 234. The trial court found there to be a visual standard, incorporating the use of the Baikie measurements. Although there is conflicting evidence, we find that the trial judge was reasonable in his conclusion, and in the absence of a clear showing of error we will not disturb his findings. Under these circumstances, a

consideration of the correctness of the Cooke survey or any other survey is irrelevant.

Defendants point out that the Castonguay parcel by survey overlaps defendants' parcel and that the Castonguay deed, therefore, should be reformed at the same time defendants' rights are determined. It is unquestionably difficult to attempt to determine proper boundary lines as between only 2 land owners when, inevitably, other property holders in the forty will be affected. However, the boundary between Castonguays and Bailiffs is a matter in which plaintiffs have no concern. It is within defendants' power to initiate the proper proceedings to determine such a boundary. In the instant case, we are empowered only to decide the matter before us: That is, the reformation of the deed given to defendants.

For the same reason, the trial court was correct in excluding evidence that plaintiffs claimed the Holmes survey to be correct to their advantage with respect to a boundary with the owner adjoining them on the west. That owner is not joined as a party here. Although the dispute between all of these parties will be resolved by a solution of the same problems (the intent of parties, or the correct location of the southeast corner) they are not properly before us and we cannot adjudicate questions that are not before us.

Defendants contend that they were led by plaintiffs to believe that plaintiffs would accept the Cooke survey as the correct one, and that the building on the disputed strip was done in pursuance of such belief. The testimony as to whether or not there was reliance is contradicted in almost every respect: As to the conversation that took place in plaintiffs' house on April 18th; plaintiffs' knowledge of the subsequent activities of the defendants, particularly the digging of the basement and the moving of the buildings; and why plaintiffs waited so long to chal-

lenge the survey. It is useless to review this testimony here. In a situation of this nature, where it is impossible to determine from the record what the true facts are, we give great weight to the findings of the trial court who had the opportunity to see and hear the witnesses firsthand. He stated:

"The only situation under the facts in this case where an estoppel could possibly have arisen was at the time of and actions subsequent to the conversation in April, 1948 when defendants told plaintiff that by reason of a survey defendants had procured, the latter owned land west of the line that had been accepted by the parties for 6 years as defendants' west line, and were going to move on, and that their survey would stand law. Thereupon plaintiff said something must be wrong and he would look into it. In quick succession, defendants proceeded to have a basement dug on the disputed strip and their house moved thereon. In my opinion the defendants unquestionably relied upon their survey in so doing, and certainly not upon any act, representation or admission of plaintiff, nor upon his silence, for none of these elements was present."

We are bound to accept the findings of the trial court as correct in the absence of a clear showing of error. None has been made here. Plaintiffs are not estopped to contend that the standard which should be used in measuring the holdings of the respective parties was the visual one set out by them previous to the delivery of the deed.

Although in proper cases a court of equity will consider hardship as a factor in its determination, this is not the case for the application of such a doctrine, despite the fact that defendants will suffer losses if forced to move their property. This situation calls for the application of the equitable doctrine that where 1 of 2 innocent persons must suffer loss, it must be borne by that one of them who by his conduct

has rendered the injury possible. The trial court found that defendants moved their buildings on the disputed strip without permission of plaintiffs and, as stated above, we accept that finding as correct. Having done so, they must take the consequences of their actions, which are the cost of moving the small buildings from the strip and any loss on account of the excavation.

Defendants contend that even assuming they do not have the legal title to the 146-foot disputed strip, the court erred in giving them only the right to remove the improvements therefrom within 60 days; that, instead they should be able to salvage the full value of the improvements, either by having the value of the improvements determined and the owner of the land required to pay the other the amount so determined, or, at their option, having the value of the land determined and defendants pay plaintiffs this value and taking possession of the land.

Defendants cite *Whitehead* v. *Barker,* 288 Mich 19, in which it was held that one who places improvements on another's land is entitled to such relief if there are 3 concurrent essentials:

"1. He must have held possession under color of title.

"2. His possession must have been adverse to the title of the true owner.

"3. He must have acted in good faith. 16 Am & Eng Encyc of Law (2d ed), 79–83."

In the *Whitehead Case,* we also quoted the United States supreme court as having defined a bona fide possessor as one not only who supposes himself to be the true proprietor of the land but who is ignorant that his title is contested by some other person claiming a better right to it.

It can hardly be said that defendants were ignorant that their title was contested by plaintiffs and

that they thus acted in good faith. We therefore find that the order of the trial court was equitable and in accord with the facts as found.

The decree of the trial court will be affirmed, with costs to plaintiffs.

DETHMERS, CARR, BUSHNELL, SHARPE, BOYLES, and REID, JJ., concurred.

The late Chief Justice NORTH did not sit.