BRADLEY ET AL. *v.* CORNWALL ET AL.

[No. 175, October Term, 1952.]

*Decided July 2, 1953.*

*Motion for rehearing, filed by appellees August 1, 1953, denied October 6, 1953.*

The cause was argued before SOBELOFF, C. J., and DELAPLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*Eugene M. Childs* and *Le Roy Bald,* with whom were *Childs and Bald* on the brief, for appellants.

*Ridgely P. Melvin, Jr.,* with whom were *McWilliams, Evans and Melvin* on the brief, for appellees.

SOBELOFF, C. J., delivered the opinion of the Court.

Neighbors at Shady Side on the south shore of West River are here contesting over a narrow strip of waterfront land.

For clarity the diagram below is included, as it reproduces a portion of a plat prepared in 1925 by Edward Hall, Jr., surveyor. The plat is recorded among the Land Records of Anne Arundel County and all the deeds pertinent to this case make reference to it.

The precise subject matter of the controversy is the strip bounded on the north by the water's edge and on the south by the northernmost line of lots 3 and 4. Not involved in the dispute is any land west of lot 4 or its westernmost line if extended to the water; also not involved is the land east of the western line of lot 2 or the extension of that line to the water's edge.

The appellants are Miss Margaret M. Bradley, record owner of lots 1 and 2, who is said to hold title for herself and her brother, Dr. James F. Bradley. The appellees are Ernest S. Cornwall and his wife, owners of lots 3 and 4.

Both parties derive title under *mesne* deeds from the original owners, Louis A. Woodfield and Bertha Woodfield, his wife, the grandparents of Mrs. Cornwall. Lots 1 and 2 have been in the hands of several owners between the Woodfields and the Bradleys, and lots 3 and 4 passed out of the Woodfield family and back again.

It is undisputed that, notwithstanding the north line of lots 1 and 2 appearing on the plat, the deed to Miss Bradley in 1945 specifically included the land lying between these lots and the river. The deed runs to the low water mark of West River.

It is equally clear that the appellees, the Cornwalls, were originally granted lots 3 and 4, only to the line shown on the plat as the northern line of their lots. Shortly before the suit was begun by the appellees in 1952, however, they obtained a quit-claim deed from Mrs. Woodfield, who had been widowed in 1939, for that portion of the strip which lies opposite lots 3 and 4, thus extending these lots to the water.

But the Bradleys had previously, in 1945, purchased from Mrs. Woodfield the area called the "Grove" and she conveyed it to them in a deed that referred to the plat but gave no description by metes and bounds, courses and distances. There is nothing in the deed or in the plat that gives any indication as to the precise acreage intended to be conveyed. The present dispute arises because the Bradleys claim that the "Grove"

included not only the land that adjoins lot 4 on the west but also the land in controversy, on the theory that the "Grove" is L-shaped and includes the entire strip along the river's edge lying between lots 3 and 4 and the water.

It is the Bradleys' contention that the quit-claim deed made by Mrs. Woodfield to her granddaughter, Mrs. Cornwall, and to Mr. Cornwall, conveyed nothing for the grantor had already disposed of the land opposite lots 3 and 4 to Miss Bradley as part of the "Grove".

We give this simplified, perhaps over-simplified, statement of the nature of the case, without setting forth the intermediate conveyances, because we think this is sufficiently accurate for present purposes and preferable to a detailed recital of these instruments which would unnecessarily complicate the story and would serve no useful purpose. We shall, however, refer later to such material in these documents as becomes pertinent.

The Cornwalls brought suit in equity against the Bradleys to obtain a construction of the deed to the "Grove", and to obtain a determination that the deed did not transfer the disputed land as part of the "Grove" and that it is theirs under the quit-claim deed made to them by Mrs. Woodfield in 1952. In the alternative, if the Court should disagree with their interpretation as to the extent of the "Grove" and hold that the deed to the Bradleys did legally convey the strip of shore land in front of lots 3 and 4, then the appellees sought reformation of the deed so as to make it conform to the claimed intention of the Woodfields to convey nothing east of the extension of the western outline of lot 4.

It was testified by Mrs. Woodfield that the strip lying between the four lots and the river was laid out to serve as a road for those purchasing lots in the development. Apparently the "Grove" was originally intended by the Woodfields to be used as a common; but this intention was never carried out in any way and was completely abandoned when Mrs. Woodfield sold the

"Grove" to the Bradleys in 1945. It seems that no lots other than 1 to 4 had been sold in the subdivision.

Before the Bradleys' purchase a sea wall was erected in front of lots 1 and 2. There was no sea wall in front of lots 3 and 4. Shortly after the Bradleys purchased the "Grove" their contractor constructed a sea wall along the river shore from the west line of the "Grove" (or rather an extension of that line,) and the wall ran easterly until it reached a point opposite the west line of lot 4, when it turned at a right angle. The Cornwalls point to this as evidence that the Bradleys must have realized that the "Grove" did not include the strip in front of lots 3 and 4, as now claimed, and that the Bradleys built the wall to serve the "Grove" property exclusive of the strip in front of lots 3 and 4.

Dr. Bradley testified that the turn in the direction of the sea wall was due to the contractor's misunderstanding of his instructions, and that his orders were to connect the west line of the "Grove" with the sea wall in front of lots 1 and 2 so as to enclose the strip opposite lots 3 and 4. After some delay the wall was completed in 1949 so that it then ran continuously along the river in front of the "Grove" and the four numbered lots. Then in 1950, over the objection of Mrs. Hallock (who is the daughter of Mrs. Woodfield and the mother of Mrs. Cornwall), Dr. Bradley proceeded to fill the area behind the sea wall. When the wall was built in front of lots 3 and 4, these lots were owned by a Mr. George Edward Bierach, who did not protest. It is not definitely shown whether he knew of the work when it was in progress for he was living in Washington. Mrs. Hallock was not the owner of lots 3 and 4 when the fill was begun by Dr. Bradley, but the appellees, her daughter and son-in-law, had just recently purchased the lots from Bierach, and her protest against the fill may be presumed to have been made for them.

The predicament in which the parties find themselves is due in considerable measure to loose conveyancing and to other carelessness. It was testified that the

contract for the sale of lots 3 and 4 by the Woodfields to the original purchaser, a Mr. Lanigan, was made in 1926. It called for lots extending to the river. No deed was made till 1930, and then Mrs. Hallock, who in the meantime had become the owner of the lots, carried out the contract made by her parents. Unlike the contract the deed conveyed lots that did not go to the river, but only to the north line as shown on the plat. Mr. Lanigan accepted the deed and for many years, even after the discovery of the discrepancy, neither he nor the later owners, who are the predecessors in title of the Cornwalls, raised the point. Nothing was done by the successive owners to make any correction in the deed. In the meantime the Bradleys spent money on the wall.

The Bradleys, on the other hand, were also not very cautious in respect to their property holdings, for they accepted a deed to the "Grove" which merely made reference to a plat that did not clearly define what was included in that designation. It was testified by Dr. Bradley that he negotiated with Mrs. Woodfield for this property not on the ground but with the plat before them. He admitted on the witness stand that she did not specifically say whether the strip now in dispute was or was not included in the "Grove". The merest glance should have indicated to the purchaser that the boundaries of the property were at least ambiguous.

A notable feature of the plat is that it does not show where the eastern boundary of the "Grove" lies. The western line of lot 4 is the eastern boundary of the "Grove" up to the northern line of lot 4; but there is no line extending the division line between the "Grove" and lot 4 to the river. The question thus arising, "what did the deed to the 'Grove' embrace?" is the principal question in this case.

The appellees contend that it conveyed nothing east of the western line of lot 4, despite the absence of a line delineating the eastern boundary of the "Grove". The appellants maintain that the failure of the draftsman

to close the line between the "Grove" and lot 4 by extending it to the river signified an intention to include in the "Grove" the entire strip opposite lots 1, 2, 3 and 4. As to this, the appellees argue that if the Bradleys can claim under the "Grove" deed any part of the strip, why should they stop with the piece lying north of the four numbered lots; why not, just as logically, extend the claim to include land east of lot 1, which is likewise not cut off by any line on the plat? Yet the Bradleys do not assert that the strip intended to be conveyed with the "Grove" runs beyond lot 1 on the east.

It will be noted from the above diagram that the area lying west of lot 4 has on it certain dots which presumably indicate trees on the "Grove". These dots extend around and are shown in the strip north of lot 4. From this it has been argued by the appellants that the plat treats the land in question as a part of the "Grove" and that it was conveyed by Mrs. Woodfield to Miss Bradley. A look at the diagram makes it at once obvious that the appellants' argument, if accepted, would still not avail them as to that part of the strip which lies north of lot 3 for no dots appear opposite that lot. Moreover, the dots on the plat do not end in a straight line to correspond with an extension of the eastern outline of lot 4. It would seem not unreasonable to infer that the draftsman placed these dots more or less at random and that they are to be taken as a general indication only, like an architect's imaginative drawing of shrubbery embellishing a structure to be erected. No one understands such representations literally to indicate the future location of the plantings. The surveyor in this case, we think, had no thought thereby to define the outline of the "Grove". Testimony was offered to show that while the "Grove" had trees, there were actually no trees on the strip north of lot 4, thus completely refuting the appellants' argument on this point.

Complete consistency is not to be found on either side. At least as to one former owner of lots 3 and 4,

Mr. Bierach, who has been mentioned above, there is striking evidence that he had knowledge that the strip of shore land opposite his lots was not included in his grant. Before making settlement for the property he had the title searched, and complained to the seller that the lots, sold as fronting on the water, actually ended short of the water line. For this discrepancy he claimed and received an adjustment of $300.00 in his purchase price from the sellers. These sellers were trustees operating under the direction of the Court, and it is said that their making an allowance of $300.00 on Bierach's purchase price with the Court's sanction was not an adjudication by the Court that the strip did not in fact belong to lots 3 and 4, but was merely a practical disposition of a claim to avoid expensive litigation. With this we are inclined to agree, but the episode is important as showing Bierach's knowledge that the lots were not waterfront lots and that the Bradleys were claiming the intervening strip between the lots and the river. It has been suggested that Mrs. Hallock, mother of Mrs. Cornwall, who lived in Shady Side and was a party to the proceedings in which Bierach was the purchaser, also then knew of the adverse claim of the Bradleys. Indeed, at a much earlier point in the chain of title, when Mrs. Hallock owned lots 3 and 4 and she sold to a Mr. Lanigan, the deed described the lots as running to the above mentioned line on the plat, not to the river. However this may be, such knowledge of the appellees and their predecessors in title can have no bearing on any rights the appellees may have acquired under the quit-claim deed. It can become relevant on the question of the Bradleys' claim to be compensated for improvements made by them to the shore strip in controversy, during the period before those, who from time to time owned lots 3 and 4, acquired waterfront rights by the quit-claim deed of 1952.

Bierach testified that when he learned from a title search that lots 3 and 4, which he had purchased at

public sale, did not run to the water's edge he consulted a lawyer. He was advised to take the matter up directly with Dr. Bradley, and this he did before making settlement. Accompanied by Herbert S. Sassi, he went to Dr. Bradley's office in Washington. They testified that Dr. Bradley received them cordially and when they offered to pay for the supposed interest of the Bradleys in the land, the doctor declared that the disputed area was not his but belonged to lots 3 and 4, and added that if they would have a deed prepared to effect the necessary correction he would have his sister execute it. Later, according to Bierach, Dr. Bradley said, "I am sorry, my sister will not sign; she has other advisers". The doctor denied this story.

It may well be that Dr. Bradley expressed himself as Bierach and Sassi say he did, yet when his sister declined to accept his suggestion and refused to sign a deed for the disputed strip, with or without a consideration, it is not unreasonable to suppose that she was thereby confirmed in her belief that she owned the land since Bierach and Sassi had approached her brother on that assumption. From this there is no necessary inference of bad faith on the Bradleys' part any more than there should be such an inference against the owners of lots 3 and 4 on the theory that by their offer they inferentially acknowledged the Bradleys as the owners. Bierach's silence thereafter and the absence of complaint from him or anyone while the wall was under construction further fortified Miss Bradley's belief in her ownership. The truth is that both sides were aware of some uncertainty, but each we think believed his position correct.

While Bierach had received a reduction in price for what appeared to him and his attorney to be at least a plausible claim by Dr. Bradley to whom they offered money for a release of his rights under the equivocal plat, Bierach did nothing thereafter to challenge the doctor's claims after the repudiation of his alleged frank acknowledgment that the strip belonged to lots 3 and

4. Bierach remained silent while the wall went up in front of his property. If we decide that the "Grove" did not include the contested strip, we are then called on to declare whether under these circumstances the Bradleys are or are not entitled to the benefits of the doctrine of "melioration" to compensate them for the improvements they made to their neighbors' property.

Other features of the evidence have been pointed to as bearing on the question of Dr. Bradley's state of mind and belief in respect to his rights in the disputed land at the time that he made the improvements. There is testimony that at least sometime around 1948 a fence ran as an extension of the division line between lot 4 and the "Grove" to the water's edge. Who put it there and how long it was permitted to remain is not shown. Fencing out the land in controversy from the "Grove" would not be consistent with Dr. Bradley's insistence that he considered himself and his sister the owners of the disputed land. On the other hand, it was testified that he repeatedly put up a wire fence between lots 3 and 4 and the water, and this act can be interpreted only as his assertion of a claim to the strip.

It was also testified that when lots 3 and 4 were sold at auction as waterfront lots, Dr. Bradley attended the sale and did not assert a claim to the strip of beach land. His version is, "I didn't consider they were selling my property; they were considering lots 3 and 4 with Lanigan's house on it, which I didn't consider went to the river."

We fully agree with the learned Chancellor's conclusion that the deed of July 24, 1945, did not convey the disputed land to Miss Bradley, and as it is conceded that the strip had not been conveyed to any one else by Mrs. Woodfield before the quit-claim deed to the appellees in 1952, we hold that the strip now belongs to the appellees.

The holding that the deed to the "Grove" did not convey the land results from our construction of that deed and the plat to which it refers. It does not follow,

however, that the Bradleys were guilty of bad faith and therefore disentitled to compensation for the improvements.

It seems fair to say that while each side from time to time made assertions of rights against and in defiance of the other side, neither pursued a clear course or acted with determination to vindicate its claims, or to clarify a doubtful situation. Although each had knowledge of the other's adverse claim, each had some reason to entertain a belief in the rightness of its own position. When we now resolve the question by adjudication we do not think it necessary or warranted by the case as a whole for us to denounce the good faith of either the appellants or the appellees. Dr. Bradley, insisting on his supposed title, said as a witness, "I couldn't spend that much money and believe otherwise." Concededly, the mere expenditure of money in improving a neighbor's property is not enough to establish a claim for melioration, but it is an element to be considered and may or may not indicate good faith, according to the circumstances.

That the appellants were most unwise in undertaking so large an expense without first obtaining a clear definition of their rights, no one can deny; but imprudence is not the equivalent of bad faith. We cannot say that when they spent this sum they acted without color of title, or with conscious inequity. The bulk of the money had been spent before they received notice that the Cornwalls objected. Bradley's activities were not limited to a period of days but extended over approximately two years. Mrs. Woodfield, the true owner of the land on which the work was done and who lives nearby and must have known of the work, remained silent, as did also her daughter. They sat by till the granddaughter acquired lots 3 and 4.

The applicable rule is well stated in 2 *Pomeroy's Equity Jurisprudence*, sec. 419d: "Laches in legal significance is not mere delay, but delay that works a disadvantage to another. So long as parties are in the

same condition, it matters little whether one presses a right promptly or slowly, within limits allowed by law; but when, knowing his rights, he takes no steps to enforce them until the condition of the other party has, in good faith, become so changed that he cannot be restored to his former state, if the right be then enforced, delay becomes inequitable and operates as an estoppel against the assertion of the right."

To obtain the advantage of the doctrine of melioration it is not required that the person seeking such relief shall be able to show that there were no substantial adverse claims to the land which he improved, or that he had no knowledge of the existence of such claims. On the contrary, the doctrine comes into play only when such adverse claims have prevailed. It is necessary only that he shall have acted in *bona fide,* though mistaken, belief in his cause. *McLaughlin v. Barnum,* 31 Md. 425, 454.

The equities are not wholly on either side, and we do not think it equitable for the entire loss to fall on either. The appellees who come into court seeking equity, must do equity. The rule is that the real owner, when he seeks the aid of equity to establish his right to the property itself, or to enforce some equitable claim upon it, having been substantially benefited, is required upon principles of justice and equity, to repay the amount of the vendible increase in the value of his property. *Jones v. Jones,* 4 Gill, 87; *Union Hall Assoc. v. Morrison,* 39 Md. 281; *Bryan v. Councilman,* 106 Md. 380, 67 A. 279, 14 Ann. Cas. 1175; *Goldberg v. Ford,* 188 Md. 658, 53 A. 2d 665; *Easter v. Dundalk Holding Co.,* 199 Md. 303, 86 A. 2d 404.

Dr. Bradley testified that he spent $4,000 for the wall opposite lots 3 and 4, and $750 for dredging the river bottom for fill, and an additional $200 for leveling the dirt behind the wall—a total of nearly $5,000. The Cornwall property had a steadily eroding beach, already reduced to a width of 3 or 4 feet. Their tax assessment had been reduced 30% because of this condition. They

now have a protective wall that has, according to the uncontradicted testimony, added $2,400 to the value of their property. Under all the circumstances we think an award to the appellants of Twenty-four Hundred Dollars ($2400.00) would be equitable and fair to both sides.

In the rulings on the testimony and the motions to strike, we find no substantial basis for complaint by either appellants or appellees.

For the reasons given the decree declaring title to be in the appellees should be affirmed; but the appellants are entitled to a lien for the sum of Twenty-four Hundred Dollars ($2400.00).

*Decree affirmed, and case remanded with directions to amend the decree by allowance of a lien, as above indicated; costs to the appellees.*