## BEAN, ET AL. v. STEUART PETROLEUM COMPANY

[No. 475, September Term, 1965.]

Decided November 17, 1966.

Motion for rehearing filed December 19, 1966, denied January 3, 1967.

The cause was argued before HAMMOND, C. J., and HORNEY, MARBURY, OPPENHEIMER and FINAN, JJ.

Walter B. Dorsey and Charles A. Norris, with whom was Joseph A. Mattingly on the brief, for appellants.

Paul J. Bailey for appellee.

FINAN, J., delivered the opinion of the Court.

The appellants appeal from a decree of the Chancellor in the Circuit Court for St. Mary's County perpetually enjoining them, their agents, servants and employees from conducting the retail sale of petroleum products on a parcel of land found to be the subject of a restrictive covenant running with the land.

Two of the appellants, James A. Bean, et ux., were the owners of two tracts of land in St. Mary's County, one tract consisting of one hundred acres, lying on the east side of the State Road leading from Valley Lee to Calloway; the other tract, a one acre triangular parcel, lying on the west side of said road, which was known as the "Knott Property".

The appellants, James A. Bean, et ux., some years past constructed a service station, from which they dispensed Sunoco products on the property on the east side of the road. By deed dated January 26, 1962, appellants, James A. Bean, et ux., conveyed the service station and the ground immediately surrounding it (about one acre) for $30,000.00 to the appellee, Steuart Petroleum Co. The Beans at the insistence of the appellee in-

corporated in this deed a covenant running with the land, binding in perpetuity upon the grantors and their successors in title, which covenant restricted the remaining land of the grantors within 5,000 feet of the service station (on either side of the road), from being used for the retail sale of petroleum products.

There was testimony to the effect that the consideration paid was considerably in excess of the actual value of the service station and the one acre surrounding it, because of the inclusion of the restrictive covenant. After the purchase, the appellee forthwith discontinued selling Sunoco products and converted the station into a Chevron service station selling gasoline under that brand name.

On April 15, 1963, the appellants, James A. Bean, et ux., sold the one acre triangular parcel on the other (west) side of the road diagonally across from the Chevron Station, to their son, Edward Bean, et ux., the other appellants. On the same day, April 15, 1963, Edward Bean, et ux., acquired a small parcel of land, allegedly rectangular in shape (80' x 140') and contiguous to the one acre triangular piece, from Rose Stone, et vir for $1401.80. The Stone parcel was not subject to any restrictive covenants regarding its use. There was testimony that when James A. Bean bought the triangular piece of one acre in 1961, from the Will Knott estate, that James A. Bean went on the property and, together with Mrs. Rose Stone, discussed the probable location of the common boundary line between the two parcels. Neither of them had any positive knowledge as to the location of the boundary line and finally, to their mutual satisfaction, reached a parole agreement as to its location. This line was subsequently pointed out by the father, James A. Bean, to his son, Edward Bean, when the latter and his wife acquired title to both the triangular and rectangular parcels in April of 1963. Edward Bean testified that when he purchased the rectangular parcel from the Stones in April of 1963, he did so with the purpose in mind of constructing a Sunoco service station thereon. The descriptions in the deeds to both the triangular (Knott) property and the rectangular (Stone) property are so ambiguous as to render them incapable of protraction by courses and distances with any resulting logic.

There is the testimony of William E. Cosdin, employee and local representative of the appellee, that as early as the late fall of 1962, he noticed land clearing activity, by a bulldozer operator, on the land of James A. Bean, et ux., adjacent to the appellee's service station. Shortly thereafter this was discontinued and activity was commenced again on the opposite side of the State Road, on what appeared to Cosdin to be the triangular parcel subject to the restrictive covenant. Cosdin was sufficiently disturbed by this as to be prompted to check the building permits in the St. Mary's County Court House, in an effort to ascertain what was going on. He testified that his inquiry revealed that Edward Bean was constructing a service station on the property and reported this to his employer, the appellee, who instructed him to contact an attorney, which he did in the fall of 1962.

In the summer of 1963, after the service station was constructed and open for business, Cosdin and the appellee's attorney visited the property and were ordered off the property by Edward Bean.

The appellee finally filed its Bill of Complaint for a restraining order on October 17, 1963, and a petition for a survey was filed on February 25, 1964. The results of the survey showed that the new service station was 465 feet from the Chevron station. The surveyor Koval, who was an unregistered surveyor, endeavored to reconstruct the descriptions from the physical features found on the property, while reconciling them as best he could with the descriptions in the deed and with information supplied by local residents; his main effort being directed at locating the common boundary between the triangular parcel (Knott property) and the rectangular tract (Stone property). Koval and the appellee's witnesses placed a substantial part of the service station on the triangular parcel or "Knott Property" (subject to the restrictive covenant), while the appellants assailed the qualifications of the surveyor Koval and produced witnesses who placed the common boundary at such a location that the service station was on the Stone property.

The Chancellor below heard testimony, most of which was non-expert, and after a personal visit to the properties found, "that a substantial part of the Sunoco Service Station building

as well as the pump island and entrance roadways are on the Knott property."; and rendered an opinion deciding the case in favor of the appellee. Accordingly, a decree was signed July 17, 1965, restraining the appellants from selling at retail, petroleum products on the triangle tract (Knott property) owned by Edward Bean, et ux.

The court below directed its attention mainly to the question of the physical location of the boundary line between the property subject to the restrictive covenant and the property not subject to the covenant. Once it resolved that question and determined the additional fact that the service station was, in its opinion, constructed on the property covered by the restriction, it had no difficulty finding in favor of the appellee. Because, as stated in its opinion "In this case the Court has no difficulty with the law, * * *." However, this Court finds it difficult to reconcile the manner in which the lower court applied the law to the facts in the case. We are concerned with the question of estoppel operating against the appellee, a consideration which does not find its way into the rationale of the lower court.

It should be noted that counsel for all parties made the question of the site of the service station and the common boundary location between the subject and non-subject property, the main thrust of their arguments. True, appellants also raised the question as to the admissibility of the testimony of the surveyor, Koval, contending, that since he was not a registered surveyor, he was not a qualified witness competent to testify regarding the survey of the properties. This might well have given us some pause for reflection, if we thought it was controlling in this case, but we do not.

We are concerned with the contention embraced in the argument of the appellants, wherein they raised the issue that injunctive relief should be denied the appellee because it was guilty of laches. We, however, approach it from the ground of estoppel.

The testimony reveals that the appellee's representative first observed building activity, on what the court below found to be the property subject to the covenant (triangular parcel), in the fall of 1962. He immediately verified the fact that a service station was being constructed on the property by Edward Bean.

Still, in the fall of 1962, the appellee consulted legal counsel concerning the problem. Cosdin, the local representative of the appellee, drove past the location almost daily. The construction of the new service station took place only 465 feet from the appellee's Chevron station and could be easily and continually observed by the appellee. Yet, it was not until the summer of 1963, after the service station was constructed and open for business, that the appellee took any steps to register its objections to the actions of the appellant, Edward Bean. The testimony shows that in the summer of 1963, Cosdin in company with the appellee's attorney visited the new service station and made inquiry of Edward Bean, as to where the property lines were located, and were immediately ordered off the premises. It was not until October 17, 1963, that any definitive legal action was taken and then by way of the appellee filing its Bill of Complaint.

It would certainly appear to have been in order for the appellee to have properly protected itself, by lodging a protest or serving notice of its objection on the appellants, orally or in writing, when the construction work was in its incipient stages.

The older cases followed the doctrine of estoppel as it is set forth in *Cityco Realty Co. v. Slaysman,* 160 Md. 357, 363-64, 153 Atl. 278, 281 (1931) :

> "It has long been settled that 'one who stands by and sees another laying out money upon property to which he has some claim or title, and does not give notice of it, cannot afterwards, in good conscience, set up such claim or title.' *Browne v. M. E. Church,* 37 Md. 124; *Tongue v. Nutwell,* 17 Md. 212; *Carmine v. Bowen,* 104 Md. 203 et seq., 64 A. 932. But that principle has no application where * * * the true state of the title is equally available to both parties (*Browne v. M. E. Church, supra,* * * *; *Schaidt v. Blaul,* 66 Md. 141, 6 A. 669; *Park Ass'n v. Shartzer,* 83 Md. 10, 34 A. 536); * * *. Fraud, actual or constructive, in some form, is an essential ingredient of the doctrine of equitable estoppel (10 R.C.L. 688, 21 C.J. 1122), and may take the form of actual misrepresentation by

word or act, or silence, when some duty or obligation bids one speak. *Id.*; 21 C.J. 1119, 1161; 10 R.C.L. 692. *But 'mere silence will not work an estoppel'* (10 R.C.L. 692), and the principle does not apply where one stands by and sees another laying out money upon property to which he has some claim or title without giving notice of it, where the structure or other improvement is a mere encroachment on land the title to which is equally open to both parties. *Casey v. Inloes,* 1 Gill, 430; *Schaidt v. Blaul, supra."* (Emphasis supplied.)

It would appear that this Court relaxed its view that mere silence is insufficient to create an estoppel and that other misleading action coupled with the silence on the part of the party to be estopped is needed in order to find estoppel *in pais,* in the case of *Bradley v. Cornwall,* 203 Md. 28, 98 A. 2d 280 (1953). This case presented a rather complicated set of facts, but basically involved an argument over the ownership of a strip of land lying between the frontage of four building lots and a river. Each party owned two of the building lots, and disputed the claims of the other, or of their predecessor in title, to the ownership of the strip. There was a serious problem of erosion affecting the strip in front of all the lots. Bradley extended an existing sea wall to include the disputed frontage at a cost of approximately $5,000.00, Bradley then proceeded to fill in the land behind the sea wall for his own use. The Court held the land belonged to Cornwall but, invoking the doctrine of melioration, ordered that Bradley should be reimbursed for the cost of construction of the wall. There is much in *Bradley supra,* from which we can take sustenance and accordingly find it expedient to quote Chief Judge Sobeloff who spoke for the Court at some length:

"It seems fair to say that while each side from time to time made assertions of rights against and in defiance of the other side, neither pursued a clear course or acted with determination to vindicate its claims, or to clarify a doubtful situation. Although each had knowledge of the other's adverse claim, each had some

reason to entertain a belief in the rightness of its own position. When we now resolve the question by adjudication we do not think it necessary or warranted by the case as a whole for us to denounce the good faith of either the appellants or the appellees. Dr. Bradley, insisting on his supposed title, said as a witness, 'I couldn't spend that much money and believe otherwise.' Concededly, the mere expenditure of money in improving a neighbor's property is not enough to establish a claim for melioration, but it is an element to be considered and may or may not indicate good faith according to the circumstances.

"That the appellants were most unwise in undertaking so large an expense without first obtaining a clear definition of their rights, no one can deny; but imprudence is not the equivalent of bad faith. We cannot say that when they spent this sum they acted without color of title, or with conscious inequity. The bulk of the money had been spent before they received notice that the Cornwalls objected. Bradley's activities were not limited to a period of days but extended over approximately two years. Mrs. Woodfield, the true owner of the land on which the work was done and who lives nearby and must have known of the work, remained silent, as did also her daughter. They sat by till the granddaughter acquired lots 3 and 4.

"The applicable rule is well stated in 2 *Pomeroy's Equity Jurisprudence,* sec. 419d; 'Laches in legal significance is not mere delay, but delay that works a disadvantage to another. So long as parties are in the same condition, it matters little whether one presses a right promptly or slowly, within limits allowed by law; but when, knowing his rights, he takes no steps to enforce them until the condition of the other party has, in good faith, become so changed that he cannot be restored to his former state, if the right be then enforced, delay becomes inequitable and operates as an estoppel against the assertion of the right." (At 39-40, 98 A. 2d 280, 285-86.)

In the case at bar we have even a stronger plea for equitable relief. The appellant Edward Bean, had no knowledge that he was building on the wrong parcel of land, whereas in *Bradley, supra,* Bradley knew prior to making the improvements of the appellee's claim to the same land to which he claimed title and on which the sea wall was being constructed.

We cannot impute to appellant Edward Bean any bad faith which might have existed on the part of his father, if indeed any did exist. The son's knowledge of the boundary line between the property he purchased from his father (Knott property) and the Stone property, was only such as his father had imparted to him. Edward Bean was just 21 years of age. He and his wife went to the "Citizens" Bank at Lexington Park and borrowed the money with which to construct the service station. There is no evidence that this was the father's business venture. There is no evidence that the son Edward Bean and his wife were guilty of any duplicitous conduct. Accordingly, there is no reason why any possible equitable defense should not be available to them.

It should also be noted that in the law merchant *mere silence* has been held sufficient to create an estoppel, such as will prevent the drawer of a negotiable instrument from setting up the defense of forgery or want of authority to endorse. *Union Trust Co. v. Soble,* 192 Md. 427, 64 A. 2d 744 (1949) ; and *First Nat. Bank v. Wolfe,* 140 Md. 479, 117 Atl. 898 (1922).

The general principles of estoppel have been frequently discussed by this Court and a further restatement in this opinion would be redundant. However, we are constrained to quote the language employed by Judge Hammond (present Chief Judge) in the case of *Jaworski v. Jaworski,* 202 Md. 1, 10, 95 A. 2d 95, 99 (1953) :

> "One cannot stand by and see another make expenditures for improvements to property to which he has, or later asserts, some claim or title and not give any notice or objection, without losing his right in good conscience in equity to assert his own claim or title against the improvements."

We have already stressed that the testimony fails to reveal any bad faith on the part of Edward Bean or Rose Marie Bean,

his wife. It is equally important to note that the testimony does affirmatively show that the appellee knew from the inception of the construction work that it was being done in violation of the restrictive covenant which it later sought to enforce:

"Q. Who started the construction across the road?
"A. Ah—ah—
"Q. Who did you actually see doing it?
"A. Mr. Knott was doing bulldozing work in there.
"Q. Irving Knott
"A. Yes.
"Q. Across the road from what?
"A. From our Chevron Station and slightly up toward Calloway, a distance of — I figured it was, at that time, I thought it somewhere in the neighborhood of from five hundred to six hundred feet, I was just guessing—*I knew it was a violation to our contract*—" (emphasis supplied).

As Judge Oppenheimer pointed out in a recent opinion, *Travelers Indemnity Company v. Nationwide Construction Corp.*, 244 Md. 401, 224 A. 2d 285:

"We have repeatedly stated that whether or not an estoppel exists is a question of fact to be determined in each case. *Gould v. Transamerican Associates, supra,* at 224 Md. 297; *Liberty Mut. Ins. Co. v. American Auto Ins. Co.,* 220 Md. 497, 501, 154 A. 2d 826 (1959); and cases therein cited. Wrongful or unconscientious conduct on which the other party relies, to his detriment, is generally an element of estoppel in the particular circumstances, see *Liberty Mut. Ins. Co. v. American Auto Ins. Co.,* 220 Md. at 500, but an estoppel may arise even when there is no intent to mislead, if the acts of one party cause a prejudicial change in the conduct of the other." *Harrison v. McCarty,* 178 Md. 377, 13 A. 2d 544 (1940); *Benson v. Borden, supra.*"

From the facts presented by this case we are of the opinion that the doctrine of estoppel operates in favor of the appellants.

470

The appellee seeks to rely upon a technicality in pleading which should be discussed. The appellants in their brief characterize the failure of the appellee to act as laches which consequently should have been pleaded specially as it did not appear on the face of the initial pleading — *Hungerford v. Hungerford*, 223 Md. 316, 320, 164 A. 2d 518, 520-21 (1960); *Mitchell v. Cassedy*, 200 Md. 339, 343, 89 A. 2d 620, 622 (1952). Cf. *Cargill v. Brady*, 231 Md. 455, 457, 190 A. 2d 793, 794 (1963); Rule 371.

In this case we are not confronted with the question of limitations or a stale claim as was the Court in *Rettaliata v. Sullivan*, 208 Md. 617, 119 A. 2d 420 (1956). In the case at bar the record reveals a course of action that amounts to an estoppel *in pais* and this Court may not only properly take cognizance of it, but should so do. It is settled Maryland law that an estoppel *in pais* need not be pleaded specially unless it is relied upon to avoid defenses specially raised. As was said in *Bitting v. Home Ins. Co.*, 161 Md. 56, 60, 155 Atl. 329, 331 (1931):

> "Estoppel is cognizable at common law either as a defense to a cause of action, or to avoid a defense (21 C.J. 1244), and while ordinarily an estoppel *in pais* need not be specially pleaded (*Id*. 1240; *National Shutter Bar Co. v. Zimmerman*, 110 Md. 313, 73 A. 19; *Albert v. Freas*, 103 Md. 583, 64 A. 282; *Babylon v. Duttera*, 89 Md. 444, 43 A. 938; *Brooke v. Gregg*, 89 Md. 234, 43 A. 38; *Higgins v. Carlton*, 28 Md. 115), yet where it is relied upon to avoid a defense set up in a special plea it too must be specially pleaded."

In the instant case we are of the belief that the estoppel need not have been specially pleaded and Rule 371 relied upon by the appellee is not applicable.

For the reasons set forth above we must reverse the decree of the Chancellor entered in the lower court.

*Decree reversed, with costs.*