M.M. & G., INC., et al., Appellants,

v.

William JACKSON, Personal Representative for the Estate of Mary W. Brown, Appellee.

No. 90–CV–72.

District of Columbia Court of Appeals.

Argued June 10, 1992.

Decided July 2, 1992.

---

Andrew J. Kline, Washington, D.C., with whom Merritt Lee Murry, Falls Church, Va., was on the brief, for appellants.

Elizabeth M. Boyle, Washington, D.C., for appellee.

Before FARRELL and KING, Associate Judges, and GALLAGHER, Senior Judge.

FARRELL, Associate Judge:

This appeal arises primarily from the denial of an equitable lien to purchasers of property at 310 Nicholson Street, N.W., property that was returned to the true owner after the discovery of a forgery in the chain of title. Although we reject most of appellants' arguments, we remand for a determination of the present value of permanent improvements made to the property by appellant Yvonne Kinney alone, who is entitled to the value of those improvements less any damages as defined by statute.

## I.

On March 23, 1984, Mary W. Brown, the original owner of the Nicholson Street property, was admitted to Rock Creek Manor Nursing Home by her grandson, William Jackson. Mrs. Brown was suffering from Alzheimer's disease and needed constant supervision and nursing care. On September 5, 1984, Carl E. Jackson, another of Mary Brown's grandsons, recorded a deed to 310 Nicholson Street purportedly giving him fee simple title to the property and purporting to be signed by Mary Brown. As the trial court found, and as appellants concede for purposes of this appeal, the signature of Mary Brown was a forgery.

Sometime at the end of December of 1984, Carl Jackson approached M.M. & G., Inc. (doing business as A-1 Realty) about purchasing the 310 Nicholson Street property. A contract for purchase was signed on December 31, 1984, and settlement took place on January 10, 1985. M.M. & G. purchased the property for $35,000 [1] and immediately began extensive renovation work.

Meanwhile, William Jackson filed a petition for conservatorship of Mary Brown's estate on October 5, 1984. Mary Brown was declared incompetent and William Jackson was appointed conservator on February 11, 1985. During these proceedings, William Jackson saw a "For Sale" sign on the Nicholson Street property and contacted the attorney for the estate. The attorney, Arthur Konopka, made two phone calls to M.M. & G. on January 18, 1985 and February 5, 1985. These phone calls were followed by a letter on February 15, 1985, which was sent to both M.M. & G. and its attorney. The letter expressed the estate attorney's "conviction that ... Mrs. Brown[ ] lacked the mental capacity to acknowledge that deed and to convey that property at the time the document was executed." It continued: "This shall serve as notice that we regard the deed [between Mary Brown and Carl Jackson] as ineffective in its attempt to convey the property, and appropriate steps are now being taken to protect the interest of Mrs. Brown in her estate. Parties to any subsequent conveyance of the property should be advised as to the existence of this cloud on the title."

After receiving this letter, M.M. & G. continued to perform renovation work on the property. In its brief on appeal, M.M. & G. contends that it took this course of action after consulting with its attorney, who advised it that, at most, the letter asserted a claim of Mrs. Brown's incapacity to deed the property; and while District of Columbia law was unclear as to the effect of incapacity on a deed, under neighboring Maryland law the deed was voidable (as opposed to void) and so M.M. & G., as a bona fide purchaser, could prevail against any adverse claim based on the grantor's incapacity.[2] Altogether M.M. & G. spent over $12,000 on renovations.

---

1. In his oral findings of fact (but not in his subsequent written findings of fact and conclusions of law), the trial judge expressed skepticism about the propriety of this purchase by M.M. & G. "without even any consideration as to whether this [C]arl Jackson really had good title." He noted the apparent undervaluation of the property at $35,000 and the caution that should have been dictated by "a young man who is coming in selling some property that he had recently gotten title to."

2. There is no record evidence of any such advice from M.M. & G.'s attorney. Herb Greenbaum, president of M.M. & G., testified:

[W]hen I got the letter [from the estate attorney], I don't remember, what I would have done with it would have been to give it to the

On June 7, 1985, M.M. & G. conveyed the property to Yvonne Kinney for $62,000 dollars.[3] M.M. & G. did not inform Ms. Kinney of any adverse claims against the property. Ms. Kinney spent approximately $2,500 on further improvements to the property, which she lived in until early in 1988 when she began to rent it out. She also paid $2,714.77 in real estate taxes for the property between 1985 and 1988. William Jackson filed a complaint to set aside all of the deeds on August 7, 1985. Notice of this suit was provided to Yvonne Kinney at the end of October 1985.

Trial without a jury took place before Judge George W. Mitchell on March 2 and 3, 1989. Closing arguments were continued until March 28. During closing arguments, Judge Mitchell granted the estate's request for a continuance in order to file a motion to reopen the record. On April 21, 1989, the court granted the motion and continued the suit so that the estate could substitute the personal representative of Mary Brown's estate for the conservator of the estate, as Mary Brown had died during the trial. The court also granted appellants' motion to reopen discovery in order to assert the defense of after-acquired title, appellants contending that they "need[ed] to ascertain who the heirs of Mary Brown are." The court allowed further discovery and stated, "[P]ut all of this in writing and the Court will act on it...."

On August 7, 1989, the estate filed, in open court, a motion to substitute parties and was allowed to present further testimony. Thereafter, appellants requested an additional continuance, stating that until the formal substitution of parties which had occurred that morning, they had been unable to serve discovery requests and hence unable to conduct discovery on their potential defense of after-acquired title. The court denied the continuance and proceeded to enter oral findings of fact and conclusions of law. These were followed by written findings of fact and conclusions of law on September 20, 1989.

The court found that the deed from Mary Brown to Carl Jackson was a forgery. It also found that laches did not bar the estate's attempt to retrieve its property as the suit was timely filed and M.M. & G. had been put on notice of the estate's claim soon after the claim was discovered. The court set aside all of the deeds conveying the property out of the estate of Mary Brown and denied a request for an equitable lien for Yvonne Kinney as restitution for the improvements made by M.M. & G. and Kinney herself.

## II.

■ Appellants contend that the court erred in not applying the doctrine of laches to bar the suit by the estate. We reject this contention. For laches to bar an equitable action, "the defendant must have been prejudiced by plaintiff's delay, and plaintiff's delay must have been unreasonable." *Martin v. Carter*, 400 A.2d 326, 329 (D.C.1979). The trial judge concluded that "upon discovery of a possible fraudulent conveyance[, plaintiff] initiated this action

---

title attorney, which apparently was done.... During the settlement we bought title insurance and I would assume that what we would have done, and I believe what we did do was to send it to the man that represented the title insurance company. I'm not a lawyer, I don't know anything about a defective title.... I forwarded the letter to the title attorney, the one that takes care of these matters. I am not a—I don't make decisions, I get lawyers—letters from lawyers from time to time and very often they're very distracting so if I suspected that there was a problem, I sent it to the proper place. I [had] already put up our money. We were in jeopardy.

This testimony establishes at most that the letter from the estate was passed on to M.M. & G.'s attorney while M.M. & G. continued to expend funds on the renovation.

3. Yvonne Kinney executed a deed of trust conveying the property to Colonial Mortgage Service Company Associates, Inc. as beneficiary. Colonial Mortgage assigned its rights to the District of Columbia Housing Finance Agency on June 19, 1985, with The National Bank of Washington as trustees. On September 12, 1985, Yvonne Kinney, reserving a life estate for herself, conveyed a remainder in fee simple interest to her parents John Kinney and Hattie Kinney as tenants in the entirety. Along with M.M. & G., the District of Columbia Housing Finance Agency, The National Bank of Washington, John Kinney, Hattie Kinney, and Yvonne Kinney are all appellants in this action.

in a timely fashion." The judge based this conclusion on the letters sent by the estate to M.M. & G. four days after William Jackson had been appointed conservator, the conservator's report filed in April of 1985 stating that legal steps were being taken to retrieve the property, and the filing of the action four months later in August. We agree that the delay in filing suit was not unreasonable under these circumstances.

This case is factually similar to *Martin v. Carter, supra,* and the result there controls. As in *Martin,* appellee gave prompt notice of its adverse claim to the only claimant of whom it had specific knowledge, M.M. & G. And, as in *Martin,* "the most important change here—the purchase of this property by the innocent [Ms. Kinney]—is not attributable to delay by [appellee]." *Martin,* 400 A.2d at 330. Paraphrasing *Martin,* the

> actual conveyance to [Ms. Kinney] took place a mere four months after [the claim's] discovery, and despite [the estate's] clear warning to [M.M. & G.] of [the] claim. To hold this transfer against [the estate], in the face of [its] notice to [M.M. & G.], would be to allow the notified beneficiaries of a forgery to insulate their gains merely by rushing to pass title to an unwarned third party.

*Id.*[4] The fact that suit was not filed until several months later does not rise to the level of unreasonable delay. *Id.* at 330 & nn. 4, 5 (four month delay not unreasonable; court looks to period required for adverse possession, fifteen years, as a benchmark); *King v. Kitchen Magic, Inc.,* 391 A.2d 1184, 1186–88 (D.C.1978). M.M. & G., with written notice of a cloud on the title in hand,[5] cannot reasonably have assumed that the estate had abandoned its claim. The trial court correctly refused to apply the bar of laches to the estate's action.

**III.**

Appellants next contend that the court erred in refusing to grant them a continuance on August 7, 1989, to permit discovery into the potential claim of after-acquired title. The doctrine of after-acquired title holds that "if a grantor purports to transfer ownership of real property to which he lacks legal title at the time of transfer, but subsequently acquires legal title to the property, the after-acquired title inures, by operation of law, to the benefit of the grantee." *Miller–Long v. John Hanson Savings & Loan,* 676 F.Supp. 298, 299–300 (D.D.C.1987). Because Mary Brown died during trial leaving her grandson Carl Jackson as a possible heir at law to part of her estate, appellants desired to pursue this theory to support the retention of title by Yvonne Kinney. They assert that because no personal representative was appointed for the estate of Mary Brown until August 7, 1989, they were unable to serve formal discovery requests in the period allowed by the trial court (which had continued the case on April 21) and needed an additional opportunity to do so.

A motion for a continuance is "addressed to the sound discretion of the trial court and a ruling thereon will not be reversed on appeal absent a clear showing of an abuse of discretion." *Evening Star Newspaper Co. v. Covington,* 323 A.2d 718, 722 (D.C.1974); *accord, Hairston v. Gennet,* 501 A.2d 1265, 1268 (D.C.1985). Although the exact basis for the trial court's denial of the requested continuance is unclear, we find no abuse of discretion for the following reasons. First, as pointed out by appellee, the Probate Reform Act, D.C.Code § 20–105 (1989), operates to vest legal title to all of a decedent's property in the personal representative of the decedent's estate until the conclusion of a judicial distribution of that estate. *See*

---

4. Thus we do not find the failure of the estate to file a *lis pendens* notice under D.C.Code § 21–1507 (a statute which we note was revoked February 28, 1987) to be dispositive. M.M. & G. had all the information necessary to provide Yvonne Kinney with notice of an adverse claim. The estate had no duty to warn buyers of whom it was not aware. *Martin,* 400 A.2d at 329.

5. The absence of the word "forgery" from the estate's letter does not negate the actual notice of a possible adverse claim. The letter clearly stated that the estate considered the deed to be ineffective and that the estate was taking further steps to protect its rights.

*Richardson v. Green*, 528 A.2d 429, 431 (D.C.1987). Thus, at the time of trial, any claim that title legally vested in Yvonne Kinney through Carl Jackson under the doctrine of after-acquired title was unripe since the estate had vested in William Jackson as personal representative and had not yet passed to Carl Jackson as an heir-at-law of Mary Brown.

■ Second, assuming the claim could be advanced inchoately (as, for example, by imposition of a constructive trust on Carl Jackson), we are not persuaded that formal service of discovery requests was necessary for appellants to uncover the information supporting the claim. In connection with this appeal, appellants have been able to discover, simply by examining the Probate jacket of Mary Brown's estate, that Carl Jackson, as one of nine grandchildren, is an heir under the intestacy statutes to one-ninth of Mary Brown's estate. Moreover, the information that Mary Brown had died intestate and left nine grandchildren in line to inherit was provided to appellants in appellee's motion for a continuance filed on June 13, 1989.[6] As these facts form the basis of the after-acquired title claim, the contention that appellants had inadequate information on August 7 to assert the claim and could not do so without formal discovery is unpersuasive.

### IV.

■ Appellants' principal contention is that the trial court erred in denying Yvonne Kinney an equitable lien for the value of the permanent improvements to the property made by both M.M. & G. and Ms. Kinney.[7] It is well settled that a forged deed cannot validly transfer property and that even a bona fide purchaser takes nothing from that conveyance.

*Unity Banking & Saving Co. v. Bettman*, 217 U.S. 127, 135, 30 S.Ct. 488, 489–90, 54 L.Ed. 695 (1910); *Harding v. Ja Laur Corp.*, 315 A.2d 132, 135–36 (Md.1974). This jurisdiction has recognized, however, that even those who take from a forged instrument can receive an equitable lien for the value of improvements that were made by the purchaser in good faith. *Martin*, 400 A.2d at 329; *Armstrong v. Ashley*, 22 App.D.C. 368, 380 (1903), *aff'd*, 204 U.S. 272, 27 S.Ct. 270, 51 L.Ed. 482 (1907). Aside from recognizing this equitable right, however, the court has had little opportunity to describe the boundaries of the equitable lien.

■ We are informed in this discussion by the legislature's enactment of a statute allowing purchasers of property to be compensated for improvements after losing title in an ejectment action. In such an action the purchaser of property is entitled to show that "he or those under whom he claims had peaceably entered into possession of the premises in controversy under a title which he or they had reason to believe and did believe to be good, and had erected valuable and permanent improvements on the property, which were begun in good faith before the commencement of the action." D.C.Code § 16–1116 (1989).[8] One who has improved property in the above manner may receive a monetary award for the "present value of any permanent improvements that may have been placed on the premises by the defendant or those under whom he claims." *Id.* § 16–1116(2).[9] The parties agree that this statute provides the standards applicable to this case.

■ The trial judge found that M.M. & G. had notice of the estate's adverse claim by February 15, 1985. Appellants reason as follows in contending that this finding

---

6. The motion stated that "Mary W. Brown died without a will leaving nine grandsons as heirs." It has never been disputed that Carl Jackson is one of those nine heirs.

7. M.M. & G. concedes that it was paid for the value of any improvements it made before Ms. Kinney bought the property, so any equitable lien must insure to the benefit of Kinney alone.

8. The same statute was in effect at all times relevant to these proceedings.

9. Under the statutes governing an ejectment action, the plaintiff is entitled to a jury trial. That the present "quiet title" suit was tried before Judge Mitchell alone does not make the statute governing reimbursement for improvements inapplicable, especially since the estate also made an oral request for ejectment.

does not defeat their right to recover the value of the improvements under the statute. They assert that although one must have had "reason to believe" his title is good—an objective test—at the time of entering into possession of the premises, he need only have acted in "good faith" when beginning improvements to the property—a considerably more subjective standard. In particular, unable to point to prior decisions of this court or legislative history interpreting the statute, appellants urge us to construe the "good faith" requirement in accordance with an older Maryland decision, *Bradley v. Cornwall*, 203 Md. 28, 98 A.2d 280, 286 (1953), under which the person making improvements need not have acted with "no knowledge of the existence of [adverse] claims" but rather, must only have "acted in bona fide, though mistaken, belief in his case." Appellants assert that they met this minimal standard, and that even if objective reasonableness is required, they acted reasonably in proceeding with the improvements despite the February 15 notice. That is so because of the narrow content of the notice—that the estate believed Mrs. Brown lacked "mental capacity" to pass title—and the advice they received from counsel that incompetency of the grantor would be insufficient to defeat their title. We find this argument unpersuasive.

First, we perceive no valid reason to interpret the "good faith" requirement of the statute as excluding an objective "reason to believe" component. The application of two different standards at different stages in the improvement process—first when one enters into possession of the property, second when one begins the improvements—makes no logical sense. It can scarcely be argued that actual knowledge or inquiry notice ("reason to believe") is required at the outset but irrelevant at the key point under the statute when the improvements are begun. We must read the statute as a whole and in a way that harmonizes its provisions. So doing leads us to reject the notion that the mere absence of demonstrated *bad* faith on M.M. & G.'s part, irrespective of its knowledge of an adverse claim, justified its decision to begin the improvements.

This accords with decisions elsewhere which have construed good faith requirements under the equitable lien doctrine. Indeed, whatever the authority of *Bradley, supra,* at the time it was decided, the Maryland Court of Appeals more recently defined the relevant principle as follows:

> The occupier of the land of another, in order to have the equitable doctrine apply, must have acted in good faith in making the improvements and *must be ignorant of any adverse claim on the title.* This requirement is not satisfied in situations in which the occupier of the land has actual knowledge of an adverse claim to the title or in which he had knowledge of facts which, as a reasonable man, would require him to investigate and discover such an adverse claim.

*Welsh v. Welsh,* 254 Md. 681, 255 A.2d 368, 372 (1969) (emphasis added). *Accord, Michael v. Davis,* 372 So.2d 304, 306 (Ala. 1979) (allowing compensation for improvements "only when [the improver] was without knowledge of any outstanding interest"); *Worley v. Ehret,* 36 Ill.App.3d 48, 343 N.E.2d 237, 245 (1970) (even constructive notice of an adverse claim negates good faith); *Lawrence v. Lawrence,* 231 Ark. 324, 329 S.W.2d 416, 420 (1959) ("[i]mprovements made with the knowledge that another is claiming an interest in the property can hardly be characterized as improvements made under a bona fide belief of ownership"); *Vulovich v. Baich,* 286 A.D. 403, 143 N.Y.S.2d 247, 250 (1955) (claim of title must be both "honest and reasonable"), *aff'd,* 1 N.Y.S.2d 735, 152 N.Y.S.2d 281, 135 N.E.2d 40 (1956).[10]

---

10. *See also Schwebel v. Schwebel,* 107 A.2d 534, 535 (Del.1954) ("one cannot recover for improvements made under a mistaken belief of ownership when there is nothing ... which would warrant a reasonable person in entertaining such belief"); *Etherington v. Bailiff,* 334 Mich. 543, 55 N.W.2d 86, 92 (1952) (good faith possessor is one "who is ignorant that his title is contested by some other person claiming a better right to it"); *Martin v. McCabe,* 358 Mo. 118, 213 S.W.2d 497, 501 (1948) ("notice of a title adversely held is incompatible with good faith, regardless of the opinion of the occupant concerning the validity of such title"); *Tennessee, A.*

Second, we reject appellants' argument that they could fairly construe the February 15 notice narrowly and proceed with the improvements on the advice of counsel that mere "incapacity" of the grantor would not defeat their title. First, while not adverting to possible forgery, the letter explicitly stated the estate's belief that the grantor lacked competency to convey, that the deed was therefore ineffective, and that parties to any later conveyance "should be advised as to the existence of this cloud on title." Second, we have essentially nothing but appellants say-so in their appellate brief to establish the advice they received from counsel and the reasonableness of their reliance on it, *see* note 2, *supra;* and even as represented in their brief, the advice was only that under *Maryland* law incompetency would likely be insufficient to defeat their claim of title. *See Bennerson v. Small,* 842 F.2d 710, 713–14 (3d Cir.1986) (good faith, diligent inquiry into pending litigation concerning property's status not enough to retain good faith if "what remained at best were more questions"), *cert. denied,* 488 U.S. 845, 109 S.Ct. 121, 102 L.Ed.2d 94 (1988).

In any event, we are persuaded that, in this equitable context, reliance on mistaken legal or similar expert advice cannot supplant a party's actual knowledge of a concrete adverse claim. *Fouser v. Paige,* 101 Idaho 294, 612 P.2d 137, 141 (1980) (consultation with realtor and lending agent did not "change the fact that appellants had actual notice of the respondents' interest"); *Morris v. Ulbright,* 591 S.W.2d 245, 247–48 (Mo.1979) (consultation with attorney concerning adverse claim did not mean improvers were acting in good faith); *Brandon v. Stone,* 237 Mo.App. 671, 162 S.W.2d 83, 86 (1942) (improper acting voluntarily upon advice of attorney runs risk that despite this advice he will be denied equitable lien).

*See also* 42 C.J.S. *Improvements* § 7(b)(4)(a), at 436 (1944) ("occupant with notice of an adverse title or claim is not entitled to his improvements, although he in good faith believes his own title to be the better in point of law, or believes that he is within his honest rights in making improvements"). As the court stated in *Morris, supra:*

> [W]hen one knows the facts and mistakes the law by thinking his title good when it is later held not to be, he cannot recover because his actions were taken with full knowledge of the facts.... [I]t is not the fact that [the purchasers] proceeded on an erroneous opinion of law and honestly thought they owned the property which defeats their claim. Rather it is their action in making the improvements with full knowledge of the facts of the claim of [the true owner.]

591 S.W.2d at 248.

Thus we are left once again with appellants' argument that they lacked "full knowledge of the facts" of appellee's claim because the notice made no reference to possible forgery. We reject that argument and hold that the notice given to M.M. & G. was adequate to impose upon it the risk of proceeding with improvements on property later determined to be not its own. Therefore, M.M. & G. and its purchaser, Kinney, may not be compensated for improvements made by M.M. & G. after receiving that notice.

The matter is otherwise as to the improvements made by Yvonne Kinney herself. It is not disputed that she acted in good faith in making her improvements. M.M. & G. provided her with no information concerning the estate's claim, and she did not receive notice of this suit until late in October of 1985, after the bulk of her improvements had been made. Therefore,

---

& G. Ry. Co. v. Zugar, 193 Ga. 386, 18 S.E.2d 758, 761–62 (1942) ("one cannot be a bona fide holder of land unless he be ignorant of the definite adverse claim of another; and this is true, however reasonable his own claim of title may be, and however honestly it may be asserted in the erection of the improvements"); *Cobbett v. Gallagher,* 339 Pa. 231, 13 A.2d 403, 405–06 (1940) (stating that if occupiers who improved property with knowledge of an adverse claim were allowed to be compensated, "the owners of land might be in danger of being improved out of their titles and rights to them"); *Schleicher v. Schleicher,* 120 Conn. 528, 182 A. 162, 164 (1936) ("[t]he right to compensation [for improvements] ceases, however, when the occupant of the land has notice of the title of the true owner").

Kinney is entitled to the present value of permanent improvements she made to the property less any damages as defined by the statute. *See* D.C.Code §§ 16–1117, –1118. However, the trial judge made no findings respecting this amount.[11] If the parties cannot agree on it and so dispose of the remainder of the suit, the trial judge must compute this amount on remand.

*Judgment affirmed in part and vacated in part; case remanded for further proceedings consistent with this opinion.*

GALLAGHER, Senior Judge, concurs.

GALLAGHER, Senior Judge, concurring:

I concur in the court's opinion except in the discussion about advice of counsel. As I understand the opinion, the record does not support a contention that appellant continued with improvements to the house after having received the advice of counsel. (See note 2 of court's opinion.) This being so, I would think that any discussion about proceeding upon advice of counsel should be considered irrelevant; and this sensitive area of the law therefore need not be opened.

**IN RE D.E.W., Appellant.**

**No. 91–FS–691.**

District of Columbia Court of Appeals.

Argued May 18, 1992.

Decided July 2, 1992.

Christopher A. Swaby, Public Defender Service, with whom James Klein and Jo-Ann Wallace, Public Defender Service, were on the brief, for appellant.

Sidney R. Bixler, Asst. Corp. Counsel, with whom John Payton, Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, were on the brief, for appellee.

Before ROGERS, Chief Judge, and TERRY and KING, Associate Judges.

---

**11.** Nor did the judge consider whether, or to what extent, Ms. Kinney was entitled to credit    for real property taxes she had paid.